

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO.  PD-0234-17 & PD-0235-17

## SCOTT NILES, Appellant

## v.

## THE STATE OF TEXAS

## ON DISCRETIONARY REVIEW ON
## THE COURT'S OWN MOTION
## FROM THE FOURTEENTH COURT OF APPEALS
## HARRIS COUNTY

NEWELL, J., delivered the opinion of the Court in which KELLER, P.J., AND KEASLER, HERVEY, ALCALA, RICHARDSON, KEEL AND WALKER, JJ., joined. YEARY, J., filed a dissenting opinion.

Terroristic Threat is usually a Class B misdemeanor, but the offense is Class A misdemeanor "if the offense is committed against a public servant."  Scott Niles, a firefighter, was charged by information with two counts of the Class A version for threatening his fellow firefighters.  He was arraigned, tried, convicted, and sentenced on the two Class A counts.

But the jury charges had tracked the Class B misdemeanor version of the crime; the jury was not asked if the terroristic threats were against public servants. Niles raised an "illegal sentence" claim on direct appeal. The State conceded that the jury charges only authorized convictions for Class B Terroristic Threat. The court of appeals reformed the judgments to convictions for Class B misdemeanors and remanded for re-sentencing in the Class B range.[1] The question here is whether the court of appeals erred in doing so. We hold that it did. The failure to include a jury instruction on an element of an offense included within the charging instrument amounts to jury charge error subject to a harm analysis. We remand the case to the court of appeals to determine whether Appellant suffered any harm.

## Facts

Appellant was a Houston firefighter assigned to Fire Station 64. The firefighters were required to have an unexpired driver's license–a regular one to drive the ambulance, or "a class B CDL" to drive the "heavy apparatus, the ladder trucks and the pumpers." They were assigned to drive an ambulance on a rotating basis, an assignment that paid extra.

---

[1] *Niles v. State*, Nos. 14-15-00498-CR & 14-15-00499-CR, 2016 WL 7108248, at *10-11 (Tex. App.—Houston [14th Dist.] June 7, 2016) (not designated for publication).

On April 29, 2014, Appellant was assigned to drive. But a fellow firefighter overheard him say that he did not have a driver's license and reported that to Captain Bradley Maddin. Appellant was summoned to meet with Maddin and Senior Captain Andrew Haygood. They asked for his license, and Appellant showed them his concealed handgun license, something that looks "very similar to a Texas driver's license" and "said that the concealed handgun license was enough." But it wasn't, and Haygood ordered Appellant to assume the role of patient care for the day; he would not be driving the ambulance. He was ordered to get the appropriate driver's license before his next shift. Appellant did not take it well. Later that morning, firefighters Robert Gordon and Mark Keelen approached Appellant. Gordon said that Appellant was "mumbling something inaudible and Firefighter Keelen asked him what's the matter. To that he responded, I'm going to start shooting people, I just need to figure out who I'm going to take out first."[2] Keelen elaborated.

Q    And what exactly did he say?

A    I am going to shoot everyone.

_____

[2] Gordon had heard something similar from Appellant before. He testified that "Approximately two or three weeks . . . prior to the incident we're discussing, Scott Niles said to me in reference to Captain Maddin, I'd like to stab him in the neck." Gordon was aware that Appellant carried a knife, with a "very unusual shaped blade, unusual curve to it," but did not take this threat seriously at the time it was made.

Q    How did you respond to that?

A    I said, including me. And it wasn't in a joke that I said that. I said, including me.

Q    And what did he say?

A    He didn't say anything. Just stone cold face, just sat there, didn't respond at all.

Q    So once he says this and you ask him including me, then what happens?

A    It brought an uneasy feeling in my stomach immediately.

Q    And then what happened?

A    We concluded the conversation and in that time Robert Gordon who was with me at that time, you know, he and I went over to–we have a chain of command. I'm sure you've heard about it through the other guys here. My chain of command as I'm a firefighter would be an engineer operator, otherwise known as an EO. And Robert Gordon and myself went to go speak with him about this issue and tell him what was said so he can pass it on.

Q    I'm sorry. I thought you were done. You said you had an uneasy feeling in your stomach. What does that mean?

A    I was in fear, you know, immediately I was in fear. Fear for my life.

Like many of the other firefighters, Keelen knew Appellant owned several guns. Appellant would bring his guns to the station, leave them in the back of his Subaru, and take firefighters down to show them off or try to

sell them. "One that I remember, I would call it an UZI MAC-10 kind of looking gun that was black in color."[3]

Firefighter Robert Sadler and Appellant made an emergency run together that same day. Sadler testified that Appellant appeared to be "distant" and "upset" when he got in the ambulance.

> A   He got in, slammed the door, leaned against the window. He was wearing a ball cap at the time, had the ball cap down and was leaning against the window and looking straight ahead, and just kind of off in his own–in a zone, I guess you could say.
>
> Q   Did you make an effort to talk to him?
>
> A   Yes, ma'am.
>
> Q   And what did you say to him?
>
> A   I asked him if everything was okay.
>
> Q   What was his response?
>
> A   And he said that–he said that if he was going to kill everybody in the fire station, and then he told me the order in which he was going to do it.

---

[3] Appellant later turned over at least eleven guns, among them a TEC-9 with a barrel extension (SE 36); a Marlin lever action rifle, caliber 2520 (SE 33); a Mauser Action hunting rifle (SE 34); a Smith and Wesson AR-15 (SE 44); two 12-gauge shotguns (SE 46 & 56); two Marlin 22-caliber semi-automatic rifles (SE 48 & 50); a vintage Japanese military bolt action rifle (SE 58); a Jennings semi-automatic pistol (SE 52); and, a Rossi revolver, 38 Special (SE 54). The weapons were admitted for demonstrative purposes; photos of them were admitted into evidence. In opening, Appellant's attorney said, "about a year-and-a-half, a year before the incident in question here, Niles inherited a large drove of guns from an uncle of his. Niles is not a massive gun guy, but his uncle died and left him with a bunch of guns, all of which I'm sure the prosecution will introduce into evidence."

Q     And what order was that?

A     It started off with Captain Haygood, Robert Gordon, myself were the top three. And as soon as he said the first three, I asked him why.

Q     And what was his response?

A     His response was because you guys are gun owners. And then he said he would follow with the officers and then the rest of it, everybody else.

Sadler said that back at the station, and in front of another firefighter, Michael Lucas, Appellant said "if y'all piss me off, I will just come out and kill everyone."

This was not an isolated occurrence.  Appellant's next shift was on May 5, 2014.  Once again, he talked about shooting up the station–this time to firefighter Samuel Feris.

Q     All right. And you were sitting there, you were reading you said, and what happened next?

A     Scott came up and he was talking, but I was kind of trying to ignore him. I get really into my books when I'm reading. So I was trying to ignore him, but then at some point he made a statement that, I mean, I thought it was off, so it caught my attention.

Q     What did he actually say to you?

A     I don't remember exactly the words that he used, but in my statement I had it. But it's been about a year.

Q     I understand.

A      It was something to the effect of if I was going to kill everybody at the station, I would kill you last because you–it would take you longer to get away.

Captains Maddin and Haygood became aware of the threats that same day. Haygood was concerned about his personal safety, as well as that of his firefighters.

Q      And why is that?

A      Because I know that–I know what type of firearms Firefighter Niles has. I know that he has military experience. And I know that he is–I believe he is definitely irritated with me. So I was definitely–I was definitely concerned for myself, also my other–my crew members. I was concerned for everybody.

Q      What specifically were you afraid he would do?

A      Shoot me.

Q      And what specifically were you afraid he would do to the other crew members?

A      Shoot them.

The next day Haygood called Chief Robert Gutierrez for advice, and two days later, on May 7, 2014, Haygood called Chief Casey. "Chief Casey told me over the phone to tell Firefighter Niles to report [immediately] to his office." Appellant was also ordered to see Dr. Sam J. Buser, the clinical staff psychologist for the Houston Fire Department. While Appellant was absent from the station, investigators took statements

from the firefighters regarding Appellant's comments. Appellant was later told not to come back to the station.

## Trial

Appellant was charged by information with two offenses of terroristic threat–one against firefighter Mark Keelen, and one against Capt. Haygood. The informations alleged that both were public servants, Houston Fire Department Firefighters, which made the offenses Class A misdemeanors. During voir dire, both the trial judge and the State discussed the "public servant" element. The prosecutor stated,

> I have to prove that the threat was against our complainants who are public servants. Now public servants can be firefighters, police officers, judges, etc. And you've already heard in this case our complainants are Houston Fire Department firefighters. So I have to prove that they're firefighters.

During the trial, it was never an issue that Keelen and Haygood were "public servants." Instead, Appellant's defense was that this was "not a crime but a human relations issue." There was no imminent threat; "When you go up the chain of command, you're talking about H.R. When you are scared for your life, you call the police." In response to Appellant's motion for directed verdict on the cases, the trial judge said of the "public servant" element, "The Houston Department firefighter,

they got that." The judge ultimately denied the motion for directed verdict on the cases.

Unfortunately, the jury charges did not ask the jury to determine whether Keelen and Haygood were public servants. Though there were separate written charges for each count, the judge read the two as a combined charge out loud. Neither the accusation nor the application paragraph included the public servant element. And the words "public servant" do not appear anywhere in the middle of the charge.

In closing arguments both sides made numerous references to firefighters, but not "public servants." The prosecution specifically went over the three listed elements of Class B, Terroristic Threat, with the jury, and made no mention of a public servant element. The defense did tie the job of firefighter to the serving of the public:

> And to send him back to work for two more–two-and-a-half more solid days to mingle and to be in a position to have to save members of the public. Imminent threat of serious bodily injury? No, it's not. It's not even close.

The jury convicted Appellant. Sentencing was by the judge and the sentencing hearing was very informal. The prosecution did not ask for a specific penalty other than probation with a condition of "at least thirty days in the Harris County Jail." In sentencing Appellant, the judge

mentioned the context of the crime and the importance of public servants.

> And I don't think you grasp how significant it is for this many people from your station where you worked to come in and testify against you. That's significant. If firefighters are anything like police officers, they stand together, and they don't turn on one another. At least I've never seen it happen. But what you were saying and doing was so disturbing, and these guys did, they turned on you.
>
> ...
>
> And I hope that you are able to find employment somewhere, because we need guys who know what they are doing out there helping people. And if you want to do your community service with a volunteer fire department, that's fine by me, because I can't think of a better service to the community than being a firefighter or an emergency medical technician. I hope you haven't ruined your chances of doing that.

The judge sentenced Appellant in each case to one year in jail, probated for two. These were over the Class B misdemeanor range (a term not to exceed 180 days), but within the Class A range (a term not to exceed one year). TEX. PEN. CODE §§ 12.21, 12.22. The judgments also reflected that Appellant had been convicted of two counts of Class A terroristic threat.

## Appeal

On direct appeal, Appellant argued that there was *Apprendi* error in the case. "Because the 'fact' that the complainants were public servants could raise Niles' punishment range, it had to be found by the jury."

Appellant's Br. 44 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000)).  And because it wasn't, "Niles is guilty only of Class B offense[s]" and "both sentences are illegal" because they are outside the maximum punishment for a Class B offense.  The State conceded *Apprendi* error and made the same recommendation that Appellant did, that the appellate court reform the judgments to Class B, reverse the sentences in both cause numbers, and remand for new punishment hearing.  State's Br. 27.

Not surprisingly, the court of appeals did just that.  The court noted that "the jury charges track the language of the statute for the offense of terroristic threat, a Class B misdemeanor, but fail to include any instruction on the public servant element of the offense as a Class A misdemeanor."  *Niles,* 2016 WL 7108248, at *10.  It found that the "the trial court erred in rendering judgments against appellant for terroristic threat as Class A misdemeanors."  *Id*.  Finding that the one year (probated for two years) sentences imposed were void and illegal, the court reformed the judgments to reflect Class B degree offenses, and reversed for a new punishment hearing.  *Id*. at *10-11.

The State Prosecuting Attorney filed a motion for rehearing.  In the motion, the State argued that "Appellant's 'illegal sentence' claims should have been reviewed for harmless charge error as instructed by the United

States Supreme Court and our Court of Criminal Appeals." State's Mot. 1. After asking for and receiving a response from Appellant, the motion was denied. We granted review on our own motion, to decide whether the court of appeals erred in reforming the judgments to reflect convictions for the lesser included, Class B misdemeanors.

## Procedural Default

Appellant argues that the State forfeited the claim that this case involves charge error subject to a harm analysis. Appellant points out that the State failed to object to the charge in the trial court, and did not raise the issue in the court of appeals. Instead, the State conceded that Appellant's sentence was illegal. According to Appellant, this prevents the the State Prosecuting Attorney from raising the issue for the first time in its motion for rehearing to the court of appeals or in its petition for discretionary review.

It is true that, in a case in which the State is the party appealing, the basic principle of appellate jurisprudence that points not argued at trial are deemed to be waived applies equally to the State and the defense. *McClintock v. State*, 444 S.W.3d 15, 20 (Tex. Crim. App. 2014). But the State was not the appealing party in this case; the trial court entered judgments for Class A misdemeanors and sentenced Appellant in

the Class A range. Appellant was the appealing party in the court of appeals. Under these circumstances, we have held that the State, as the prevailing party at trial, need not raise a particular argument in favor of the trial court's ruling in a reply brief or even in a motion for rehearing (as it did here) as a predicate to later raising it in a discretionary review context. *Id.* (citing *State v. Gobert*, 275 S.W.3d 888, 891–92 n. 12 (Tex. Crim. App. 2009); *Sotelo v. State*, 913 S.W.2d 507, 510 (Tex. Crim. App. 1995)). An appellee's failure to make a particular argument on appeal is a factor that may be considered when this Court decides whether to exercise its discretion to grant discretionary review, but it does not bar this Court from granting review to address the issue if the Court, in its discretion, decides that review is warranted. *Volosen v. State*, 227 S.W.3d 77, 80 (Tex. Crim. App. 2007).

And, although the State Prosecuting Attorney took a stance different from that of the district attorney's office, the SPA may "represent the state in any stage of a criminal case before a state court of appeals if he considers it necessary for the interest of the state." TEX. GOV'T CODE § 42.005. That authority is not dependent on a request from a district or county attorney. *Ex parte Taylor*, 36 S.W.3d 883, 885 (Tex. Crim. App. 2001). As we have explained, the SPA "may step in without the local

prosecutor's request to 'represent the state' when in his judgment it is necessary." *Id*.; *Saldano v. State*, 70 S.W.3d 873, 877 (Tex. Crim. App. 2002) (state prosecuting attorney has primary authority to represent the State in this Court; district and county attorneys have the primary authority to represent the State on appeal in other courts, subject to the state prosecuting attorney's authority to intervene in a court of appeals).

Further, the State, in its position on rehearing and in its petition for discretionary review, does not "reformulate" Appellant's ground of error. Appellant argued that his sentence is illegal because of some error that occurred preliminary to the imposition of sentence, namely the lack of a finding regarding one of the elements of the offense. *See, e.g., Ex parte Pue*, ___ S.W.3d ___, 2018 WL 1109471 at *11 (Tex. Crim. App. 2018) (Yeary, J., dissenting) (noting a distinction between a true illegal sentence claim and one where a defendant is sentenced outside the range of punishment because of an error in the proceeding). The SPA argues in response that the judgments and sentences were not in fact "illegal" because the error that caused the trial court to sentence Appellant outside the applicable range is harmless. In other words, the judgments and sentences were correct based upon an applicable theory of law, and should have been sustained on appeal. *Martinez v. State*, 74 S.W.3d 19,

21 (Tex. Crim. App. 2002) (if the trial court's decision is correct based upon any applicable theory of law, then it will be sustained on appeal). Both parties on direct appeal recognized *Apprendi* error–that is jury charge error.[4]  The SPA pointed out to the court of appeals, and to this court, that *Apprendi* error is subject to a harm analysis, and that such an analysis applies here.  The SPA is not barred from making this argument, nor is our discretionary authority so feeble that we are barred from addressing it.  And to that argument–which is responsive to the question we asked on our own motion–we now turn.

## Analysis

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993).  The right includes "as its most important element," the right to have a jury, rather than a judge, reach the requisite finding on guilt. *Id*.  A judge can direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, but he may not direct a verdict for the State, no matter how overwhelming the evidence.  *Id*.  What the factfinder must determine

---

[4] Appellant did not make an argument based upon the Texas Constitution, and the Texas Constitution was not the basis for the court of appeals' decision.

to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder "beyond a reasonable doubt" of the facts necessary to establish each of those elements. *Id*. at 277-78; *Patterson v. New York*, 432 U.S. 197, 210 (1977); *In re Winship*, 397 U.S. 358, 364 (1970). "[T]he Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated." *Sullivan*, 508 U.S. at 278. "It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine (as *Winship* requires) whether he is guilty beyond a reasonable doubt." *Id.* So, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Id*.

In *Apprendi v. New Jersey*, the Supreme Court held that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must likewise be submitted to a jury, and proved beyond a reasonable doubt. 530 U.S. at 490. The Court noted any possible difference between an "'element' of

a felony offense[5] and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding." *Id*. at 478. So sentencing factors, like elements, are facts that have to be tried to the jury and proved beyond a reasonable doubt. *Id*. at 490. The fact at issue in *Apprendi* was whether the crime of possession of a firearm had been committed with a purpose to "intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *Id*. at 469. Because that "hate crime" factual determination authorized an increase in the maximum prison sentence for the offense from 10 to 20 years it had to be decided by a jury beyond a reasonable doubt.

In *Blakely v. Washington*, the Court made clear that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." 542 U.S. 296, 303 (2004). Blakely had pleaded guilty to the kidnapping of his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months.

---

[5] When a misdemeanor defendant faces incarceration, as here, the due process principles involved in felony trials are equally applicable to misdemeanor trials. *Argersinger v. Hamlin*, 407 U.S. 25, 32-33 (1972).

*Id*. at 298. But, after the judge made a finding that the kidnapping was committed with "deliberate cruelty," the judge imposed a sentence of 90 months—37 months beyond the standard maximum. *Id*. at 300. This, the Court held, violated Blakely's Sixth Amendment right to trial by jury.

But the Supreme Court has made clear that a violation of these constitutional rights (to a jury determination of whether the State has proven "beyond a reasonable doubt" each of the elements of the crime charged and any sentencing factors that increase the penalty for a crime beyond the prescribed "statutory maximum") is not "structural" error. *Neder v. United States*, 527 U.S. 1 (1999); *Washington v. Recuenco*, 548 U.S. 212 (2006). Unlike a jury charge which misdefines the State's burden of proof as being less than beyond a reasonable doubt, such violations can be subject to a harm analysis. *Neder*, 527 U.S. at 9; *Recuenco*, 548 U.S. at 222.

Neder was charged with mail fraud, wire fraud, and bank fraud. *Neder*, 527 U.S. at 6. Materiality is an element of all three crimes, but the district court failed to include materiality as an element of the offenses in its instructions. *Id*. at 4-6. The Supreme Court nonetheless held that harmless-error analysis applied to these errors, because "an instruction that omits an element of the offense does not *necessarily*

render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id*. at 9. And it did not do so in Neder's case:

> Neder was tried before an impartial judge, under the correct standard of proof and with the assistance of counsel; a fairly selected, impartial jury was instructed to consider all of the evidence and argument in respect to Neder's defense against the tax charges. Of course, the court erroneously failed to charge the jury on the element of materiality, but that error did not render Neder's trial "fundamentally unfair," as that term is used in our cases.

*Id*. So the omission of an element is not like the giving of a defective "reasonable doubt" instruction. Only the latter "'vitiates *all* the jury's findings,' and produces 'consequences that are necessarily unquantifiable and indeterminate.'" *Id*. at 11 (quoting *Sullivan,* 508 U.S. at 281–82).

Recuenco was charged with assault with a deadly weapon, a handgun. The jury found him guilty and answered the special "deadly weapon" issue in the affirmative. *Recuenco*, 548 U.S. at 214. It did not specifically find that the "deadly weapon" used was a "firearm" which finding, under Washington law, calls for a mandatory three-year enhancement. *Id*. at 215. The judge nevertheless sentenced Recuenco pursuant to the "firearm" enhancement. The State conceded a Sixth Amendment violation occurred under *Blakely,* but urged the Supreme

Court of Washington, unsuccessfully as it turned out, to find the *Blakely*

error harmless. *Id*. at 216. The question before the United States

Supreme Court was whether *Blakely* error could ever be deemed

harmless. *Id*. at 217-18. Washington and the United States argued that

the case was indistinguishable from *Neder*. *Id*. at 220. And the Supreme

Court agreed.

> The only difference between this case and *Neder* is that in
> *Neder*, the prosecution failed to prove the element of
> materiality to the jury beyond a reasonable doubt, while here
> the prosecution failed to prove the sentencing factor of
> "armed with a firearm" to the jury beyond a reasonable doubt.
> Assigning this distinction constitutional significance cannot be
> reconciled with our recognition in *Apprendi* that elements and
> sentencing factors must be treated the same for Sixth
> Amendment purposes.

*Id*. *See also Alleyne v. United States*, 570 U.S. 99, 113 (2013) ("the core

crime and the fact triggering the mandatory minimum sentence together

constitute a new, aggravated crime, each element of which must be

submitted to the jury"). Susceptibility of the errors in *Recuenco* and

*Neder* to a harm analysis did not turn on the fact that the district judges

made the formal findings on the missing elements or sentencing factors

in those cases. *See Recuenco*, 548 U.S. at 214-15 (the trial court applied

a 3-year firearm enhancement to respondent's sentence based on its own

factual findings); *Neder*, 527 U.S. at 6 (the court found, outside the

presence of the jury, that the evidence established the materiality of all the false statements at issue). Rather, it rested on the following legal principles: constitutional error at trial alone does not entitle a defendant to automatic reversal; most constitutional errors can be harmless; and where defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis. *Recuenco*, 548 U.S. at 218, *Neder*, 527 U.S. at 8.

That is why many different state courts have relied on these cases to hold that an omission of a element (whether it be an essential element of the offense or a sentencing "element") from jury instructions does not require automatic reversal, and may be harmless error. *See Campos v. State*, 217 So. 3d 1, 8 (Ala. Crim. App. 2015) (jury instructions failed to ask jury to find that victim was 6 or under, and defendant was 21 or older); *State v. Lizardi*, 323 P.3d 1152, 1156 (Ariz. Ct. App. 2014) (jury instructions failed to ask jury to find that defendant had been on parole on the date of the prohibited possessor offense); *People v. Merritt*, 392 P.3d 421, 427 (Cal. 2017) (jury instructions failed to ask jury to find certain essential elements of robbery), *cert. denied*, 138 S.Ct. 315 (2017); *State v. Ardoin*, 58 So. 3d 1025, 1041-1045 (La. Ct. App. 2011)

(jury instructions failed to ask jury to find that victim was under 13, and defendant was 17 or older); *State v. Rende,* 907 N.W.2d 361, 363-64 (N.D. 2018) (jury instructions failed to ask jury to find that defendant knew trooper was working in official capacity during the traffic stop); *State v. Ochoa*, 341 P.3d 942, 943-44 (Utah Ct. App. 2014) (jury instructions failed to ask jury to find that defendant was inmate in a correctional facility). *See also People v. Mountjoy*, ___ P.3d ___, 2016 WL 3094453, *2 (Colo. App. Apr. 24, 2017) (rev. granted) (collecting federal and state cases holding *Apprendi/Blakely* harmless if the record shows beyond a reasonable doubt that a jury would have found the fact or facts relied on to aggravate, had the jury been asked to do so). In all of these cases the courts asked whether the element not included in the instructions was inherent in the elements that the jury did find. If the missing element was logically encompassed by the guilty verdict and was not in fact contested, the error was considered harmless. *See*, *e.g.*, *United States v. Stanford*, 823 F.3d 814, 832 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 453 (2016) (discussing *Neder*).

We applied these rules in *Olivas v. State*, 202 S.W.3d 137 (Tex. Crim. App. 2006). Structural (or automatically reversible) error goes to a complete mis-direction or failure to instruct on the reasonable doubt

standard; a failure to instruct the jury on one element of an offense or a failure to submit a sentencing issue to the jury under *Apprendi* is not structural error; it is subject to a harm analysis. *Id*. at 142-43 (citing *Sullivan, Recuenco* and *Neder*). As we explained, "[i]f omitting an element entirely from the jury charge is not structural error, it naturally follows that the failure to instruct the jury on the State's burden of proof regarding one element of an offense (or on a sentencing issue) is not structural error." *Id*. at 143. *See also Brock v. State*, 495 S.W.3d 1, 12 (Tex. App.—Waco 2016, pet. ref'd) (rejecting, in a retaliation against a public servant case, the argument that instructing jury that the county judge complainant was a "public servant" under Texas law, instead of asking jury to make that determination, was structural error).

Appellant argues that the sentence in his case was illegal because he was sentenced outside the appropriate range of punishment. But, as discussed above, this is not an illegal sentence case. The error in this case is like that in *Neder*. The error was the omission of an element of the offense from the jury charge even though the element had been pleaded in the charging instrument and tried before the jury. *Cf*. *Wooley v. State*, 273 S.W.3d 260, 272 (Tex. Crim. App. 2008) (holding that it violated due process to affirm a conviction based upon a theory of party

liability that had not been included in the indictment or presented to the jury while acknowledging that merely omitting an element of the offense in the jury charge did not necessarily violate due process).  Both parties on direct appeal recognized that the error in this case was *Apprendi*-type error.[6]  What they didn't recognize is that such error is subject to a harm analysis.

---

[6] Appellant argued

> In Apprendi, the United States Supreme Court clearly held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (quoting *Jones v. United States,* 526 U.S. 227, 243 (1999)). Because the "fact" that the complainants were public servants could raise Niles' punishment range, it had to be found by the jury.

Appellant's Br. 44-45.

The State, in its brief–acknowledged the *Apprendi* error

> To obtain a conviction for terroristic threat against a public servant, the elements of the offense must be included in the charging instrument, submitted to a jury, and proven beyond a reasonable doubt. *Jones v. U.S.,* 526 U.S. 227, 232 (1999); *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that, other than a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). An element of the offense is defined as the "forbidden conduct, the required culpability, any required result, and the negation of any exception to the offense." TEX. PENAL CODE ANN. § 1.07(a)(22)(West 2015). . . . Whether the complainant was a public servant is a fact that changes the degree of the offense; therefore, it was an element of the offense that should have been submitted in the jury charge.

State's Br. 26-27.

**Conclusion**

Appellant went to trial on informations of terroristic threat of a public servant. This provided Appellant with notice of the charged offenses and the ability to prepare a defense, as required by our state and federal constitutions. Like Neder, Appellant was tried before an impartial judge, under the correct standard of proof and with the assistance of counsel; a fairly selected, impartial jury was instructed to consider all of the evidence. The element of Keelen and Haygood's status as public servants was not submitted to the jury, violating Appellant's Sixth Amendment right to a jury trial, but that error did not render Appellant's trial "fundamentally unfair." That failure did not vitiate all the jury's findings, or produce consequences that are necessarily unquantifiable and indeterminate. The failure went unnoticed–by the parties and the judge–until Appellant brought it to the attention of the appellate court. Because that failure is subject to a harm analysis, the court of appeals erred to reform the judgments to Class B offenses without first analyzing whether the jury charge error resulted in harm. Therefore, we reverse the judgment of the court of appeals and remand the case to the court of appeals for proceedings consistent with this opinion.

Delivered: June 13, 2018

Publish