

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRADFORD VERNON BLAKEWAY, | § | No. 08-23-00278-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | 394th Judicial District Court |
| v. | § | of Jeff Davis County, Texas |
| | § | |
| THE STATE OF TEXAS, | § | (TC# CR2300919) |
| | § | |
| Appellee. | § | |

**MEMORANDUM OPINION**

Appellant Bradford Vernon Blakeway was indicted by a grand jury on four separate offenses stemming from an event that occurred on February 20, 2023, in which Appellant allegedly threatened, assaulted, and kidnapped Jeff Fisher in retaliation for Fisher testifying against him in a prior court proceeding. A jury found Appellant guilty of one count of first-degree aggravated assault by threat and one count of aggravated assault by causing bodily injury, both with the use of a deadly weapon and both in retaliation against Fisher for his service as a witness; one count of aggravated kidnapping with the use of a deadly weapon; and one count of retaliation for threatening Fisher due to his prior service as a witness. In this appeal, which is from the conviction

1

for first-degree aggravated assault by committing bodily injury, Appellant contends the trial court erred by failing to instruct the jury on an essential element of the offense, i.e., that he assaulted Fisher in retaliation for his service as a witness.[1] For the reasons set forth below, we find that he is estopped from raising this issue on appeal, and we affirm his conviction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Events prior to the offense

The victim, Jeff Fisher, testified at trial as follows. He and Appellant had been friends and neighbors since 2007, living in a rural area approximately 20 minutes from Fort Davis, Texas called the Davis Mountain Resort (the DMR). Fisher and his wife assisted Appellant when he suffered two strokes—one in 2018, and a second in late 2019 or early 2020. Fisher often bought groceries and ran errands for Appellant, as Appellant had difficulty driving due to his vision issues.

After his second stroke, law enforcement forced Appellant to go to the hospital in an ambulance. Thereafter, Appellant, who was never a "fan" of law enforcement, and believing they had no right to enter the DMR, told Fisher he was "frustrated" and "disgruntled" with law enforcement and believed they were "trying to kill him." In Fisher's presence, over the course of several days, Appellant began to "make threats to the legal community and the . . . people in the courthouse," and began voicing an intent to go to the courthouse and "shoot lawmen." On one occasion, Appellant told Fisher that he was "liable to wake up one morning . . . and go down to the courthouse, kill civilians, and then kill all men and keep killing." Fisher believed he was the

---

[1] The grand jury issued separate indictments for each of the four offenses, but the trial court consolidated them for purposes of trial. Appellant has filed separate notices of appeal for each of his convictions. We address the other three appeals in separate opinions that we issue this day in Cause Numbers 08-23-00277-CR, 08-23-00279-CR, and 08-23-00280-CR.

only person to whom Appellant voiced his threats.

Taking the threats seriously, Fisher reported them to the authorities. Appellant was later charged with making a terroristic threat. He was in jail for approximately 18 months awaiting trial.[2] In December 2021, at Appellant's jury trial, Fisher was the State's main witness. There, Fisher testified that he heard Appellant threaten to "shoot people at the courthouse" and "go down to the courthouse and kill lawmen." The trial resulted in a hung jury. The State thereafter filed a motion to dismiss the charge, as it had not discovered additional evidence that would "change the outcome of a second trial." The trial court granted the motion on February 22, 2022.

Several months later, on November 30, 2022, Appellant appeared at the office of William Ghormley, II, the elected treasurer for the DMR corporation, who recalled Appellant asking his office to inform all residents that no law enforcement officer was allowed in the DMR. When Ghormley informed him that he would need a court order to prevent anyone from entering the DMR, Appellant responded that he did not need one from "those evil people." Ghormley recalled Appellant specifically referring to the county sheriff and his deputies, a specific Texas Department of Public Safety officer, and Judge Ferguson[3], contending "they were lying evil people and that he didn't need their help or their permission." Ghormley also recalled Appellant saying that Fisher was "an evil, lying, deceitful, man and that he was going to get him," which Ghormley interpreted to mean Appellant intended to do "bodily harm" to Fisher. Ghormley reported the matter to the sheriff's office and, that same afternoon, provided a written statement, which was introduced in

---

[2] The record reflects that prior to his 2021 trial, an expert found Appellant incompetent to stand trial, but the jury disagreed and found him competent.

[3] Judge Ferguson is the presiding judge of the 394th Judicial District Court in Jeff Davis County in which Appellant's trial for terroristic threat was held.

evidence at the current trial.

### B. The events of February 20, 2023

#### (1) The assault on Fisher

According to Fisher, he had no contact with Appellant between the time the trial court dismissed the terroristic threat charge and February 20, 2023, when he encountered him in the DMR "campground" area. Fisher, who does "well service[s]" in the area, explained that he leased a space at the campground where he kept storage containers for his business equipment and tools. He recalled that he was moving some equipment from his truck into the storage containers at approximately 9:30 a.m. that day, when he observed Appellant's parked vehicle approximately 200 feet away by the "washateria."

Appellant began walking toward Fisher at a "brisk pace," and as he got closer, Fisher saw that Appellant was holding a gun. Appellant told Fisher, who was standing on his truck at the time, to get down from the "goddamn truck, you motherfucker, or I'm going to blow your fucking head off." After Fisher complied, Appellant pointed the gun at him and told him to raise his hands, saying he had a "warrant for [his] arrest" and was "making a citizen's arrest." Fisher testified that Appellant then ordered him, at gunpoint, to put his hands up and walk over to the storage containers approximately 12 to 15 feet away, while continuing to threaten him. Appellant told Fisher to put his hands on the containers then "frisked" him for weapons. Appellant directed Fisher to clasp his hands on his head and walk over to Appellant's truck. As he walked, Appellant continued to threaten to "blow [Fisher's] fucking head off" if he tried to turn or move away from him.

Upon reaching Appellant's truck, Appellant directed Fisher to walk to the passenger side and put his hands on the hood. Fisher recalled Appellant standing behind him saying Fisher had

4

"ruined [his] life," stolen gasoline from the reserve tanks on Appellant's property, and stolen money from him—apparently referring to occasions on which Appellant had given him money to buy groceries and supplies for him, all of which Fisher denied.[4] Appellant repeated that he had a "warrant for [Fisher's] arrest" but that he would release Fisher if he would "go tell the Judge that [he] lied about [Appellant] wanting to go down to the courthouse and burn it down." Fisher responded that he did not say that to the judge. When Appellant asked him what he did say, Fisher replied that he "told them" he had heard Appellant say he was "going to go into the courthouse and shoot lawmen" and "kill lawmen." Fisher recalled the conversation ending at that point. When asked if he believed Appellant was "angry" with him for reporting the threats, Fisher testified that Appellant did not express that he was, but Fisher acknowledged that Appellant may have been angry with him over being in jail while awaiting trial on the terroristic threat charge resulting from Fisher's report.

Fisher recalled that after their conversation ended, Appellant began backing away while keeping the gun pointed at him and telling him to "stay still" or he would "blow [his] fucking head off." Appellant then took an ax handle from his truck and came toward Fisher. Holding both the gun and the axe handle, he told Fisher he was going to "teach" him something. Fearing Appellant was going to harm him, Fisher "broke and went into him." A struggle ensued, during which Appellant hit Fisher on his left arm with the axe handle. As Appellant was hitting him, Fisher grabbed the axe handle and hit Appellant over the head with it four or five times in an attempt to incapacitate Appellant and "defend [his] life." Fisher continued to hit Appellant on his head,

---

[4] According to Fisher, Appellant had never accused him of stealing prior to this event. Fisher testified that he had receipts for all the purchases he made for Appellant.

5

shoulder, and back with the axe handle until the gun flew out of Appellant's hand. He then hit Appellant one final time to prevent him from retrieving the gun. After unsuccessfully trying to calm Appellant down, Fisher fired three shots in the air as a call for help, after which Appellant told him "I'm done."

### (2)   Events following the assault

Fisher tried to "herd" Appellant to an area where his cell phone had service so he could call 911, but Appellant continued to threaten him. Fisher then "bolted" and drove off in his truck to Joy Bates's house. Bates, Fisher's neighbor, testified at trial that when Fisher arrived, he had a gun and an axe handle, and appeared "scared" and was "shaking." Fisher told her Appellant had assaulted him. Bates recalled that although Fisher did not appear injured, he had blood on his clothes, which Fisher told her came from Appellant's head after Fisher hit him with the axe handle. According to Bates, Fisher attempted to call 911 from her house but was unable to due to poor cell phone service. Fisher then walked across the street where she believed he was able to call 911.

Fisher confirmed that he was able to call 911 from another neighbor's house to report that he had been assaulted by Appellant. The 911 operator testified that Fisher, sounding "frantic," reported that Appellant had assaulted him but that he had been able to take Appellant's gun and hit Appellant with it.

Chief Deputy Jeff Walker of the Jeff Davis County Sheriff's Office and Officer Victor Lopez of the Marfa Police Department were dispatched to the scene of the incident. The officers testified that when they arrived, Fisher pulled up in his vehicle at a high rate of speed and jumped out with a gun and an axe handle in his hands, appearing to be scared and upset. Fisher informed the officers that Appellant had approached him earlier that morning, threatened him at gunpoint,

6

and taken an axe handle from his vehicle. Fisher described the struggle that ensued, during which he was able to take the gun and axe handle from Appellant, acknowledging that he hit Appellant's head with the axe handle in response to Appellant's threats.

The officers did not recall seeing any blood on Fisher, but they both observed blood on the axe handle, which Fisher acknowledged came from Appellant's head when he hit Appellant. The officers recalled that Fisher appeared uninjured, but for bruising on his left arm. Deputy Walker took two photographs of Fisher's left arm that day, which were admitted in evidence at trial. Fisher's wife also took photographs of the bruising on his arm two or three days later, which Fisher provided to the sheriff's office and were also admitted in evidence. Fisher acknowledged that he did not seek medical treatment for the injuries to his arm but averred that his arm "hurt."

Officer Lopez recalled that approximately 20 minutes after his interview with Fisher, he drove to the Jeff Davis Sheriff's Office, where he encountered Appellant and his neighbor, Daniel Gunn, who was taking Appellant to the hospital. Appellant informed Officer Lopez that Fisher had "hit him in the back of the head with a rock and had kicked him a couple times in the ribs and took his gun away from him." Observing that Appellant was "bleeding pretty bad" from his head and had blood all over him, he did not question Appellant at the time. He believed it was more important that Appellant be taken to the hospital. Still photographs were later obtained from Officer Lopez's body camera, which were introduced in evidence at trial, depicting Appellant sitting in the passenger seat of Gunn's car with his head covered in blood.

At trial, Gunn testified as a defense witness. He stated that he and Appellant generally did not have much contact with each other, even though they had been neighbors for ten or 12 years. However, he recalled that on February 20, 2023, Appellant came to his door covered in blood and

7

appeared to have been beaten. Appellant informed him that Fisher had hit the back of his head with a rock and beat him with an axe handle after taking his gun. Appellant told Gunn that he wanted to call the Texas Department of Public Safety (DPS), rather than the Sheriff's Office, but Gunn was unable to find a number for DPS.[5] At some point, Appellant asked Gunn to drive him to the hospital. On the way, Gunn stopped in Fort Davis, where they encountered Officer Lopez and spoke with him about the incident before continuing to the hospital. Gunn believed that Appellant spent the night in the hospital although he was not asked to pick him up the next day.

Relevant to this appeal, a grand jury indicted Appellant in April of 2023 on one count of the first-degree felony offense of aggravated assault, alleging that on or about February 20, 2023, Appellant "intentionally, knowingly or recklessly cause[d] bodily injury to Jeff Fisher by striking Jeff Fisher with an ax handle, and the defendant used or exhibited a deadly weapon, namely an ax handle, during the commission of the assault, and the defendant was acting in retaliation against or on account of the service by Jeff Fisher as a witness."

### C. Appellant's defense and the jury's verdict

At trial, Appellant's attorney argued that Fisher's story was not credible, contending that it made no sense for Appellant, who was much older and weaker than Fisher, to attack him in broad daylight.[6] He argued that Appellant was the true victim in the case, given his medical

---

[5] The same 911 operator who received Fisher's call testified that she also received a call from Officer Lopez, who informed her that Appellant "wanted DPS." However, the operator informed Officer Lopez that DPS would not respond to an incident in a "residential area," and she therefore did not attempt to connect him to DPS.

[6] Prior to trial, two employees from the jail where Appellant was being held, including the nurse, contacted Appellant's attorney about their concerns regarding Appellant's competency. They reported he was suffering from increasing signs of dementia. Appellant's attorney filed a motion for a competency examination, but at a hearing on the motion the month before trial, defense counsel informed the trial court that he did not believe a competency evaluation was necessary, as he believed Appellant was able to communicate effectively with his office, understand the nature of the charges against him, and assist him with trial preparation. Upon agreement of the parties, and finding

condition and Fisher's lack of any significant injuries. The State maintained that Fisher was credible, and his story was consistent.

The jury was instructed that it could find Appellant guilty of the offense of aggravated assault "by caus[ing] bodily injury to Jeff Fisher by striking him with an axe handle [and] did this. intending to cause bodily injury; or [] knowing that he would cause bodily injury; or with recklessness about whether he would cause bodily injury; and . . . during the alleged assault, used or exhibited an ax handle, a deadly weapon." The jury found Appellant guilty of the offense of aggravated assault by causing bodily injury, and the trial court, treating the offense as a first-degree felony, sentenced him to 20 years in prison and assessed a $1,000 fine.[7] This appeal followed.

## II. THE JURY CHARGE ERROR

In his sole issue on appeal, Appellant contends the trial court erred by failing to instruct the jury that it was required to find beyond a reasonable doubt that he committed the assault in "retaliation against or on account of the service by Jeff Fisher as a witness," arguing the "retaliation" requirement, as pled in the indictment, constituted an essential element of the offense. We agree that "retaliation" was an essential element of first-degree aggravated assault which the State was required to establish in the guilt-innocence phase of trial. But as explained below, we conclude Appellant is estopped from challenging this aspect of the jury charge on appeal based on his trial conduct.

---

no basis for finding Appellant incompetent, the trial court denied the motion. However, at the punishment phase of the trial, defense counsel presented the testimony of the same two jail employees, who testified to their concerns.

[7] The trial court ordered this sentence to run concurrently with the sentences imposed for his other three convictions in this matter.

9

### A. Standard of review

"A jury-charge-claim analysis involves two steps: First, we determine whether the charge is erroneous. If it is, then we must decide whether the appellant was harmed by the erroneous charge." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013); *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005) (en banc)). In general, there are two standards of review for jury-charge-error claims. *Id*. (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)).

If a defendant timely objects to an alleged jury-charge error, the record need only show "some harm" to obtain relief, i.e., reversal is required if the error was calculated to injure the rights of the defendant. *Id.*; *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). But if the defendant failed to timely object to the charge in the trial court, we may only reverse his conviction if we find that the charge "error was egregious and created such harm that the defendant did not have a fair and impartial trial." *Marshall*, 479 S.W.3d at 843; *see also* Tex. Code Crim. Pro. Ann. art. 36.19 (providing that when an appellate court reviews a jury charge error, "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial").

A third possibility exists when, as here, the defendant participates in preparing the very same portion of the jury charge he is attempting to challenge on appeal and agrees to submit it to the jury. In that instance, the defendant may be estopped altogether from contending there is error in that portion of the charge on appeal, as doing so would be "inconsistent" with his position at trial. *See Ruffins v. State*, 666 S.W.3d 636, 643 (Tex. Crim. App. 2023) (explaining the concept of

10

estoppel in the context of jury charge error).

### B. Applicable law

A trial court has the obligation to instruct the jury on "the law applicable to the case." *See* Tex. Code. Crim. Proc. Ann. Art. 36.14 ("in each felony case and in each misdemeanor case tried in a court of record, the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case"). The "law applicable to the case" includes the statutory definitions that affect the meaning of the elements of the offense. *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011); *see also Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009) (the trial court must communicate to the jury each statutory definition related to the charged offense). Thus, [b]ecause the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012).

Here, the essential elements of the offense of aggravated assault are set out in §§ 22.01 and 22.02 of the Texas Penal Code. Section 22.01 provides that a person commits the offense of assault if "the person intentionally, knowingly, or recklessly causes bodily injury to another . . . intentionally or knowingly threatens another with imminent bodily injury . . . or intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." Tex. Pen. Code Ann. § 22.01. Section 22.02(a) provides that the offense becomes an aggravated assault if the person commits assault and the person: "(1) causes serious bodily injury to another . . . or (2) uses or exhibits a deadly weapon during the commission of the assault." Tex. Pen. Code Ann. § 22.02(a)(1)(2). And § 22.02(b) provides that an aggravated assault is a felony of the second

degree "except that the offense is a felony of the first degree if it is "in retaliation against or on account of the service of another as a witness, prospective witness, informant, or person who has reported the occurrence of a crime."[8] Tex. Pen. Code Ann. § 22.02 (b)(2)(C).

When, as here, a statute provides that a certain fact will enhance an offense to a higher level, the "fact" is considered an element of the offense that the State must prove at the guilt-innocence phase of trial. *Calton v. State*, 176 S.W.3d 231, 236 (Tex. Crim. App. 2005) (en banc) (where statute provides that the existence of a prior conviction raises the offense of evading arrest from a Class B misdemeanor to a third-degree felony, the existence of the prior conviction was an element of the offense which the State was required to prove at the guilt-innocence phase of trial, rather than merely a sentencing enhancement); *Niles v. State*, 555 S.W.3d 562, 564 (Tex. Crim. App. 2018) (where statute provided that the offense of terroristic threat is increased from a class B misdemeanor to a Class A misdemeanor when it is committed against a public servant, court treated the "public servant" requirement as an element of the offense for purposes of determining jury-charge error); *Baltimore v. State*, 689 S.W.3d 331, 342–43, 348 (Tex. Crim. App. 2024) (where statute provided that an offense of unlawfully carrying a weapon is raised from a Class A misdemeanor to a felony if the offense is committed on any premise licensed for the sale of alcoholic beverages, court treated the "premises" requirement as an element of the offense).

Accordingly, because the State was required to establish that Appellant committed the assault on Fisher in retaliation for his prior service as a witness to enhance the aggravated-assault offense from a second-degree felony to a first-degree felony, we agree that the retaliation allegation

---

[8] We note that although this Code provision was amended effective September 1, 2023, the amendments did not alter the relevant portions of the statute applicable to Appellant's case.

12

was an element of the offense which the State was required to prove at the guilt-innocence phase of trial. Therefore, the trial court's failure to include the retaliation element in either the abstract or application portion of the jury charge when instructing the jury on the aggravated assault offense was in error.[9] However, as explained below, Appellant expressly agreed to this omission; Appellant agreed instead to allow the jury to make a finding on "retaliation" in a different portion of the charge. He is thereby estopped from raising a complaint about the structure of the jury charge in this regard on appeal.

### C.  Appellant is estopped from challenging the structure of the jury charge.

As set forth above, Appellant was charged with aggravated assault by causing bodily injury to Fisher for striking him with an axe handle, enhanced to a first-degree felony based on the allegation that he assaulted Fisher in retaliation for his service as a witness in the prior court proceeding. Appellant was also charged with the offense of retaliation based on the allegation that he "intentionally or knowingly threaten[ed] to harm . . . Jeff Fisher, by an unlawful act, namely threaten[ing] to kill him, in retaliation for or on account of the service of Jeff Fisher as a witness." During a break in Appellant's trial in which he was tried on both offenses, the trial court initially held an "informal" jury charge conference during which it memorialized an agreement the parties had reached to the effect that the "retaliation claim" was "the same as the enhancement element" of the aggravated-assault offense. The trial court further explained that the parties had agreed it could "rely on the jury's finding beyond a reasonable doubt as to retaliation under [the retaliation charge] and then apply that [finding] to the aggravated assault charges for enhancement purposes."

---

[9] In the abstract portion, the trial court instructed the jury: "A person commits the offense of aggravated assault if the person intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault."

13

When asked if this constituted their agreement, both parties responded that it was, with defense counsel adding that he was "interested" in seeing what that would "look like." Subsequently, at the formal charge conference, the trial court asked the attorneys if they had reviewed the proposed jury charge—as set forth below—and asked if they had any corrections, deletions, or additions. Both responded they did not.

In accordance with the parties' agreement, the trial court instructed the jury that it could find Appellant guilty of aggravated assault by causing bodily injury if it found that Appellant caused him bodily injury "by striking him with an axe handle [and] did this intending to cause bodily injury; or [] knowing that he would cause bodily injury; or with recklessness about whether he would cause bodily injury; and . . . during the alleged assault, used or exhibited an ax handle, a deadly weapon." Separately, the trial court instructed the jury that "[a] person commits the offense of retaliation if the person intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a . . . witness, prospective witness . . . or another who has reported . . . the occurrence of a crime."[10] The court further instructed the jury that it could find Appellant guilty of retaliation, as alleged in the indictment, if it found beyond a reasonable doubt that Appellant "intentionally or knowingly threatened to kill Jeff Fisher and communicated this threat to Jeff Fisher in person, [that] killing Jeff Fisher would be an unlawful act; and [that Appellant] did this in retaliation for or on account of the service or status of Jeff Fisher as a witness." And once the jury found Appellant guilty of

---

[10] The Penal Code provides: "A person commits [the offense of retaliation] if the person intentionally or knowingly harms or threatens to harm another by an unlawful act: (1) in retaliation for or on account of the service or status of another as a: (A) public servant, witness, prospective witness, or informant; or (B) person who has reported or who the actor knows intends to report the occurrence of a crime." Tex. Pen. Code Ann. § 36.06 (a).

both offenses, the trial court presumably applied the jury's "finding" on the retaliation offense to enhance the aggravated-assault conviction to the level of a first-degree felony, as previously agreed to by both parties, without objection by Appellant.

On appeal, however, Appellant contends it was error for the trial court to structure the jury charge in this manner and to apply the jury's finding on retaliation to the aggravated-assault offense, asserting that the "act" alleged in the retaliation indictment was "different" than the act alleged in the aggravated-assault indictment. This is opposed to the position defense counsel took in the trial court.

As set forth above, Appellant expressly agreed that the retaliation offense was based on the same factual allegation as the aggravated-assault enhancement. He also agreed that only one instruction on retaliation was needed in the jury charge with respect to both the retaliation offense and the aggravated-assault enhancement. Accordingly, we conclude that, at the very least, Appellant had some responsibility for the manner in which the jury was instructed. He is therefore estopped from complaining about the structure of the jury charge on appeal, as doing so is inconsistent with his prior conduct at trial. *See Ruffins*, 666 S.W.3d at 643 (Tex. Crim. App. 2023) (where defense counsel expressly stated that he was "good" with the trial court's reasonable-doubt instruction, which defense counsel himself requested, he had at least "some responsibility" for the alleged error in the jury charge and was therefore estopped from asserting an "inconsistent" position on appeal by contending the instruction was erroneous) (citing *Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999), *cert. denied*, (2000); *Woodard v. State*, 322 S.W.3d 648 (Tex. Crim. App. 2010)).

Appellant's sole issue on appeal is overruled.

## III.  CONCLUSION

The trial court's judgment is affirmed.


LISA J. SOTO, Justice


August 29, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

(Do Not Publish)

16