

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0556-20

---

**PHI VAN DO, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

---

KELLER, P.J., delivered the opinion of the Court in which HERVEY, RICHARDSON, NEWELL, KEEL and MCCLURE, JJ., joined. RICHARDSON, J., filed a concurring opinion in which HERVEY and NEWELL, JJ., joined. NEWELL, J., filed a concurring opinion in which HERVEY, RICHARDSON and MCCLURE, JJ., joined. YEARY, J. filed a dissenting opinion in which SLAUGHTER, J., joined. WALKER, J. filed a dissenting opinion in which YEARY, J., joined.

A first-time DWI is a Class B misdemeanor unless the State also proves that an analysis of

a specimen of the person's blood, breath, or urine showed an alcohol concentration level of 0.15 or

more at the time the analysis was performed, in which event it becomes a Class A misdemeanor.

Appellant's charging instrument included the 0.15 allegation, but the State did not read the allegation

until the punishment stage of trial. The parties agree that the 0.15 allegation is an element of the offense of Class A misdemeanor DWI. They also agree that an error occurred, but they disagree on what kind of error it is. The State also contends that the court of appeals erred in its harm analysis. Assuming the parties are correct that 0.15 allegation is an element, we conclude that the error would be the denial of the right to a jury determination of that element. We also conclude that this purported error was harmless because the 0.15 allegation was uncontroverted and the record indicates the defendant could not bring forth facts to contest it.

## I. BACKGROUND

### A. Facts

Appellant was charged by information with driving while intoxicated (DWI). The information included the aggravating allegation that "an analysis of a specimen of the defendant's BREATH showed an alcohol concentration level of at least 0.15 at the time the analysis was performed." The guilt stage of trial was before a jury and the punishment stage was before the trial court. At the guilt stage, the prosecutor read only the portion of the information that included the base elements of DWI, without the 0.15 aggravating allegation. Appellant pled "not guilty." No comment or objection was made by either party regarding the State reading only the base elements of the DWI offense to the jury.

The evidence at trial showed the following: Appellant's vehicle hit another car. Appellant approached the other car to ask if the occupants were okay, and one of the occupants noticed that Appellant smelled of alcohol. The police officer who investigated the offense noticed that Appellant smelled of alcohol and had slurred speech. Appellant admitted to the officer that he had been driving and had had two beers. Appellant was taken to the Houston Police Department Central Intoxilyzer

station for further evaluation. While there, he took and failed two field sobriety tests: the one-leg-stand and the walk-and-turn tests. These were captured on video. According to the technician who later administered the breath test, Appellant slurred some of his words, but his mannerisms and speech patterns did not look like those of someone who was highly intoxicated.[1]

Appellant consented to a breath test. The technician who administered the breath test testified that he was a certified operator for the test, and he told the jury about the procedures he followed in connection with the test. He testified that the testing machine was not damaged, that he obtained "a valid breath sample" from Appellant, and that the machine produced a test showing a valid breath sample.[2]

A technical supervisor testified that the results for the two breath samples showed alcohol concentration levels of 0.194 and 0.205. She explained the scientific theory underlying the machine that analyzed the samples and said that this theory was accepted by the scientific community. She then explained how the instrument applied this theory and said that the instrument applied the theory properly in Appellant's case. She said that the machine was properly functioning when it took the breath samples, and it could accurately detect and quantitate alcohol on a person's breath. She also testified that there was a complete analytical report, that there were no incomplete test messages, that

---

[1] The technician testified on direct examination to Appellant failing the field sobriety tests. His opinion about how intoxicated Appellant looked on the video was given on cross-examination, when he agreed that, although there was some slurring of Appellant's speech, "a person [who] is presumed to be highly intoxicated . . . would not exhibit the mannerisms and speech patterns evidenced in this video." The technician also agreed that Appellant was from Vietnam and that English was not his primary language. On redirect examination, the technician testified that everyone shows intoxication differently and that not every intoxicated person has slurred speech. He also agreed that a person could be intoxicated and speak normally.

[2] Before testifying about obtaining a valid breath sample, he testified that suspects typically provide two samples to the breath machine. Appellant did provide two samples.

everything was clearly printed, that all of the error blanks were zeros, that the test was complete in the analysis box, and that the signature of the person who operated the machine was at the bottom of the report. She also testified that the two samples were within the allowed 0.02 concentration of each other. She also discussed the concept of tolerance to alcohol:

> Tolerance is the ability to mask those outward signs of intoxication. Just because a person—just because a person has a high tolerance, does not mean their concentration will not show what they've had. If you had a six-pack of beer, your concentration will show you had a six-pack of beer even though you may not outwardly look like you consumed that much.

On cross-examination, the technical supervisor was asked various questions about the behavior she would expect from someone who tested at a 0.20: whether she would expect to see slurred speech, disorientation as to time and place, not being able to carry on a conversation, having mental confusion, passing out, or not being able to converse and tell people their phone numbers and how to travel up and down the freeways. To all of these questions she responded, "It's a possibility." At the end of these series of questions, she added, "Everybody shows outward signs of intoxication differently." When asked if "those are the standard things that you would expect that with a breath test result that is purportedly that high," she responded, "Again I can't look at a person and say, this person is a .20 based off their actions. Everybody shows signs of intoxication differently." She also acknowledged that radio frequency interference with a test was possible.

The technical supervisor further testified on cross-examination that the operational system check for the test occurred at 11:56 p.m. She said that this is when the test technically began. She said that the first breath sample was taken at midnight. She admitted that, in a sworn affidavit for an administrative license revocation (ALR) hearing, she stated that the breath test started at 11:55 p.m. and that this was an inconsistent starting time from what she testified to at trial.

On redirect examination, the technical supervisor testified that any radio frequency interference with the breath test would have caused an incomplete result, and she agreed that "since we have a valid test here, that did not happen."

In closing argument, defense counsel contended that the discrepancy in the technical supervisor's testimony regarding the start time for the breath test "makes the test erroneous." Defense counsel characterized the discrepancy as between 11:55 p.m. and midnight. Defense counsel also contended that the video showed that Appellant's speech was not slurred, that he was "in tune with time and place," and that his speech was otherwise clear. He also argued, "You don't get a 19 or a 2-0 and then have somebody evidence clear speech."

The jury charge alleged the base elements of DWI: that the defendant operated a motor vehicle in a public place while intoxicated. "Intoxicated" was defined as either (1) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, or (2) having an alcohol concentration of .08 or more. The jury charge did not include the 0.15 aggravating allegation, and neither party objected to its absence. The jury returned a guilty verdict and was released from service.

Four days later, the trial judge held the punishment stage of trial. At the beginning of the proceeding, the State read the 0.15 aggravating allegation. Defense counsel objected:

> Your Honor, that element was not presented to the jury for their consideration as part of deliberations. We would object to the enhanced element at this time. They tried it as a loss of use case.

The State responded:

> The response from the State is that it's a punishment element. It wasn't an element of the actual offense. We did have evidence that the analysis of the breath was above a .15. We tried it as—all three were able to prove intoxication and the BAC actually

came out at trial.

The trial court overruled the objection and immediately found the 0.15 aggravating allegation to be true. No evidence was presented at the punishment stage, the State offered no closing argument, and defense counsel requested probation.

When the trial court asked if there was any legal reason why the Court should not impose punishment, defense counsel and Appellant both said that there was not. The trial court then assessed a sentence of one year, probated the sentence for twelve months, assessed a fine of $250, and talked about some conditions of probation. The trial court asked the defendant if he had any questions, and the defendant said that he did not. The trial court then asked, "Anything else from anyone?" The prosecutor and defense counsel both responded that they had nothing further to say.

### B. Appeal

Appellant complained on appeal about the trial court's determination of the 0.15 aggravating allegation at the punishment stage of trial.[3] Specifically, his third issue argued that the trial court erred in treating the allegation as a punishment matter when it was in fact an element of the offense.[4] And his fourth issue argued that the trial court denied him his federal constitutional right to a jury determination of the allegation.[5] The State conceded that the 0.15 aggravating allegation was an element of a Class A misdemeanor DWI offense and should have been submitted to the jury at the

---

[3] *See Do v. State*, ___ S.W.3d ____, 2020 WL 1619995, *1 (Tex. App.—Houston [14th Dist.] 2020).

[4] *Id.*

[5] *Id.*

guilt stage of trial.[6]  The court of appeals agreed.[7]

In addressing the standard for determining harm, the court of appeals said that preserved jury charge error is evaluated for "some harm" unless the error was constitutional, in which case the standard is whether the error was harmless "beyond a reasonable doubt."[8]  Concluding that the error was constitutional, the court of appeals applied the "beyond a reasonable doubt" standard.[9]  The court of appeals concluded that the error was not harmless beyond a reasonable doubt because the jury charge permitted conviction on a theory other than alcohol concentration, there was evidence of intoxication besides the breath test, and the breath test results did not go uncontested.[10]  For this last proposition, the court pointed to evidence that Appellant was "speaking clearly and coherently" at the Central Intoxilyzer station and that the breath-test technician "agreed that highly intoxicated people would not present mannerisms and speech patterns like appellant did in the video."[11]  Also in support of this last proposition, the court of appeals noted the technical supervisor's inconsistent statements about the starting time for the breath test.[12]  The court also recited defense counsel's argument purporting to contest the breath results on these two points.[13]

---

[6]  *Id.* at *5.

[7]  *Id.* at *4-5.

[8]  *Id.* at *5.

[9]  *Id.*

[10]  *Id.* at *6-7.

[11]  *Id.* at *7.

[12]  *Id.*

[13]  *Id.*

The court of appeals reformed the conviction from Class A misdemeanor DWI to Class B misdemeanor DWI and remanded the case for a new punishment hearing.[14]

## II. ANALYSIS

### A. The Parties' Arguments

In three grounds, the State takes issue with the court of appeals's harm analysis. First, the State contends that the court of appeals erred to apply the constitutional harm standard to unobjected-to jury charge error. Second, the State contends that the court of appeals erred in concluding that a punishment-stage objection preserved error in the guilt-stage jury charge. Finally, the State contends that the court of appeals erred to find harm under any standard because the 0.15 aggravating element was an uncontested matter established by objective facts.

Appellant contends that the State's harm arguments are irrelevant because there was no error in the jury charge. He argues that the State failed to join issue on the 0.15 aggravating element when it failed to read that allegation at the guilt stage of trial. He further contends that, in failing to read this allegation, the State abandoned it. Consequently, Appellant contends, the jury was correctly charged on Class B misdemeanor DWI. Appellant further argues that the error in this case was the trial court allowing the State to join issue on the 0.15 aggravating element at the punishment stage of trial. Appellant contends that this error was properly preserved and that no harm analysis was required because the State failed to obtain a finding on the aggravating element. He analogizes to the situation in which an appellate court finds the evidence legally insufficient.[15]

---

[14] *Id.* at *8.

[15] When asked at oral argument what harm standard would apply if the error at issue were found to be jury charge error, Appellant's attorney agreed with the State's position that the applicable harm standard would be the egregious-harm standard for unobjected-to jury-charge error. Appellant's

### B. Assuming 0.15 Allegation is an Element

The parties and the court of appeals have all concluded that the 0.15 aggravating allegation is an element of the offense of Class A misdemeanor DWI. There is at least a colorable argument for that conclusion under *Oliva v. State*,[16] but we need only assume the truth of that conclusion without deciding it. Assuming the correctness of that conclusion, we address the views of Appellant and the court of appeals.

### C. Appellant's "Failure to Join" Argument

In *Niles v. State*, the jury charge failed to include an element of the charged offense of terroristic threat that raised the offense from a Class B misdemeanor to a Class A misdemeanor—that the offense was committed against a public servant.[17] We held that this failure was jury-charge error rather than a conviction on a lesser-included offense.[18] One salient difference exists between the present case and *Niles*, and it is the crux of Appellant's argument. In *Niles*, the public-servant element was presumably included in the allegations read by the State when it read the information at the guilt stage of trial.[19] Here, however, the 0.15 aggravating element was not read to the jury at

---

attorney also agreed that such an error would be harmless, although he contended that was because Appellant could not be harmed by being subjected to a lesser offense.

[16] *See* 548 S.W.3d 518, 530 (Tex. Crim. App. 2018) ("If, on the other hand, the statutory aggravating fact would be part of the circumstances of the offense on trial, that would be a factor in favor of construing the statutory aggravating fact as an element of the offense.").

[17] 555 S.W.3d 562, 564 (Tex. Crim. App. 2018).

[18] *Id.*

[19] *See id.* at 566-67. The opinion does not explicitly say that occurred but it does not say that the public-servant element was omitted from the reading of the information and, unlike the present case, the State took the position from the outset that it had to prove the element at guilt. *See id.*

the guilt stage of trial. Because it was not read, Appellant reasons, the 0.15 aggravating element was not a part of the case at the guilt stage of trial, and so the jury charge in this case (unlike in *Niles*) was not erroneous.

Although Appellant's failure-to-join argument might, at first blush, appear to be an issue that should have been the subject of a cross-petition because the court of appeals did not address it, his contention goes to the nature of the error itself, and the State's criticisms of the court of appeals's harm analysis necessarily turn, to some degree, on the nature of the error. What exactly the error in this case was and when it occurred can greatly affect the harm analysis, making a careful inquiry into the nature of the error itself necessary. Also, Appellant's view, if correct, would have dramatic consequences for how this sort of issue is analyzed, and failing to account for it could create an unacceptable distortion in our jurisprudence. And the State has responded to his view in a reply brief, so we have input from the adverse party.

But we conclude that Appellant's view is incorrect. All of the cases that involve a failure of the State to timely read from the charging instrument involve the *entire* failure to read (or timely read) the charging instrument or the *entire* failure to timely read the punishment enhancement

allegations.[20] None involve the late reading of only some of the elements of the charged offense.[21]

Moreover, Appellant's proposed remedy—striking the 0.15 finding from the case—misconceives the nature of the error and is at odds with the remedy applied in cases involving joining an issue. Error in connection with the State's failure to timely join issue on an allegation in the charging instrument is treated as trial error, not as an insufficiency of the evidence.[22] And the error is not the late reading of the charging instrument or of a punishment enhancement allegation but the introduction of evidence before the charging instrument or punishment allegation was read.[23] When the charging instrument was not read at all, the remedy on appeal is a new trial,[24] since, in such a case, none of the evidence was properly before the jury. When the charging instrument is read

---

[20] *See e.g.*, *Turner v. State*, 897 S.W.2d 786, 789 (Tex. Crim. App. 1995) (punishment enhancement paragraph not read); *Warren v. State*, 693 S.W.2d 414, 416 (Tex. Crim. App. 1985) (punishment enhancement paragraphs not read); *Welch v. State*, 645 S.W.2d 284, 286 (Tex. Crim. App. 1983) (punishment enhancement paragraph read late at punishment stage); *Peltier v. State*, 626 S.W.2d 30, 30 (Tex. Crim. App. 1981) (indictment not read and defendant did not enter plea to it in jury's presence); *Essary v. State*, 53 Tex. Crim. 596, 600, 111 S.W. 927, 929 (Tex. Crim. App. 1908) (indictment read late at guilt stage). *See also Marshall v. State*, 185 S.W.3d 899, 901-02 (Tex. Crim. App. 2006) (after the parties had closed, trial court entered plea of not true on behalf of defendant, and prior convictions to enhance punishment in notice of intent to enhance punishment were alleged for the first time in jury charge).

[21] *See supra* at n.20.

[22] *Marshall*, 185 S.W.3d at 902-03; *Welch*, 645 S.W.2d at 286.

[23] *See Warren*, 693 S.W.2d at 416 (commenting that a mistrial motion in a prior case that "was directed at the trial court's decision to allow the State to read the indictment to the jury after having elicited testimony from a witness" was "properly overruled" and referring to procedure to cure the error); *Welch*, 645 S.W.2d 286 ("The error that occurred was the trial court's erroneous ruling on appellant's request to strike" the testimony of a witness that occurred before the reading of the enhancement allegation. "Had the court made a correct ruling it would have been proper for the State to reintroduce that testimony by bringing [the witness] back to the stand.").

[24] *Peltier*, 626 S.W.2d at 31-32; *Essary*, 53 Tex. Crim. at 604, 111 S.W. at 931.

late, or when a punishment enhancement allegation is read late, the error can be cured by reading the charging instrument or punishment allegation (to the jury if it is the factfinder), having the accused enter a plea to it, and having the State reintroduce the evidence heard before the charging instrument was read (or the parties can stipulate to the evidence).[25] When the charging instrument is read late, a defendant forfeits error if he fails to raise an objection that puts the trial court on notice of the correct curative measures.[26] For example, a defendant could object to evidence that was introduced before the charging instrument or enhancement allegation was read (essentially requesting that the evidence be stricken), and such an objection would place the trial court on notice of the State's need to reintroduce the evidence.[27] What the defendant cannot do is simply object to the late reading of the charging instrument.[28] Contrary to the practice of taking curative measures in response to the late reading of a charging instrument, Appellant made no request for curative measures when the 0.15 allegation was read late; he simply wanted the 0.15 allegation excluded from consideration, and that remedy was not an option.

---

[25] *Warren*, 693 S.W.2d at 416 ("The procedure to be followed has been long established: upon learning of the error, the indictment is read to the jury, the accused enters a plea and the State reintroduces the evidence; or the parties may stipulate to the evidence."); *Welch*, 645 S.W.2d at 286.

[26] *Warren*, *supra* (citing *Castillo*); *Welch*, *supra* at 285 ("The testimony of Woody, having been presented before appellant's plea and not having been stipulated or reintroduced, was not properly before the jury, and appellant's objection was sufficient to point out this defect to the trial court."); *Castillo v. State*, 530 S.W.2d 952, 954 (Tex. Crim. App. 1976) (Where the State requested that it be allowed to reintroduce the evidence and the trial court declined to do so, "in the absence of an objection directing the court to the correct procedure, we hold that the error was not preserved, under the circumstances here presented. Appellant's motion was for a mistrial and it was properly denied by the court.").

[27] *Welch*, *supra.*

[28] *See supra* at n. 26 (citing *Warren* and *Castillo*).

Crafting curative measures at the punishment stage of trial for what happened in this case would be a challenging task, which might make Appellant's novel remedy of striking the charging-instrument allegation seem simple in comparison.[29] But the challenge in fashioning appropriate

[29] In a Texas case, a jury first found the defendant guilty of driving while intoxicated, and then, after a special-issue hearing, found that his BAC was 0.15 or more at the time the analysis was performed. *Diamond v. State*, 613 S.W.3d 536, 540 (Tex. Crim. App. 2020). We did not specifically comment on this procedure, but we did ultimately affirm the denial of habeas relief. *See id.* at passim & 548. In a California case, the State was allowed to reopen the guilt stage of trial after the close of the penalty stage evidence to submit to the jury a special issue regarding intent to kill as an aggravating circumstance. *People v. Harris*, 47 Cal. 3d 1047, 1055 (1989). The California Supreme Court did not explicitly comment on the permissibility of this procedure but held that error in omitting the instruction from the original guilt stage jury charge was harmless because the State's theory and the overwhelming evidence showed that the defendant was the triggerman and not a mere party to the offense. *Id.* at 1099-1100. In *Welch*, our Court said in a footnote, "The State cannot reopen and present more guilt stage evidence after the verdict is returned," though it cited no authority for that position. 645 S.W.2d at 285 n.1. In the present case, the State would not have needed to reopen the evidence—the breath test results were introduced at guilt—but would have needed to reopen the verdict. There is statutory and constitutional support for the conclusion that jeopardy does not terminate when the defendant had notice at the guilt stage of the aggravating element, the aggravating element had not been submitted to the jury, and the trial had not yet ended when the problem was discovered. *See* TEX. CODE CRIM. PROC. art. 37.07, § 3(c) ("If the jury finds the defendant guilty and the matter of punishment is referred to the jury, the verdict shall not be complete until a jury verdict has been rendered on both the guilt or innocence of the defendant and the amount of punishment."); *Price v. Georgia*, 398 U.S. 323, 329 (1970) ("this Court has consistently refused to rule that jeopardy for an offense continues after an acquittal, whether that acquittal is express or implied by a conviction on a lesser included offense *when the jury was given a full opportunity to return a verdict on the greater charge*") (emphasis added); *Pope v. State*, 509 S.W.2d 593, 595 (Tex. Crim. App. 1974) (quoting *Price*). *See also Price*, 398 U.S. at 326 ("concept of continuing jeopardy . . . has application where criminal proceedings against an accused have not run their full course"). *Cf. Turner v. State*, 518 S.W.2d 243, 244 (Tex. Crim. App. 1975) (defendant was acquitted of charged offense of murder with malice when that offense was submitted, the jury found defendant guilty of lesser offense of murder without malice, and mistrial was declared after jury deadlocked on punishment). Theoretically, with jeopardy having not terminated, the guilt proceeding in the present case could have been reopened. But recalling the jury after four days would not have been permitted. *See Cook v. State*, 390 S.W.3d 363, 372-73 (Tex. Crim. App. 2013). That might theoretically leave open the option of a mistrial as to guilt. And a failure to request a mistrial can forfeit error for failing to grant one. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (right not to be subject to incurable jury argument can be forfeited). Curing error in connection with an allegedly late reading of a guilt allegation at the punishment stage seems easier if the same factfinder decides both stages of trial—judge or jury—but it might be possible to cure

curative measures exposes the untenability of the entire idea of splitting an element off from the offense for the purpose of determining whether the State has joined issue on it. We conclude that there is no such thing as joining issue on only some of the elements of an offense in the charging instrument.

Appellant's proposed remedy would make sense if the State's failure to read the 0.15 allegation at the guilt stage of trial were viewed as an abandonment of that allegation, and Appellant seeks to have it viewed that way. But the rule for abandonment is that the "State may, with the consent of the trial court, dismiss, waive, or abandon a portion of the" charging instrument.[30] This rule contemplates that the State take "affirmative action" to effectuate an abandonment and that it obtain the trial court's permission to do so.[31] Neither occurred in the present case. Simply failing to read an allegation is not an affirmative act to abandon it. And the trial court does not grant permission to abandon a portion of a charging instrument simply by accepting a plea. What happened in this case illustrates very well why an abandonment did not occur: the State believed that the 0.15 allegation was a punishment issue, so it never intended to abandon the allegation. The

error even in a two factfinder trial, and if it is, that possibility would suggest that Appellant forfeited any such error in this case.

[30] *Duran v. State*, 492 S.W.3d 741, 745 (Tex. Crim. App. 2016) ("State may, with the consent of the trial court, dismiss, waive, or abandon a portion of the indictment.") (citing *Ex parte Preston*, 833 S.W.2d 515 (Tex. Crim. App. 1992)); *Preston*, 833 S.W.2d at 517 (same) (citing as "see also" *Wallace v. State*, 145 Tex. Crim. 625, 170 S.W.2d 762 (Tex. Crim .App. 1943)). *See Wallace*, 145 Tex. Crim. at 629, 170 S.W.2d at 764 (citing predecessor to Art. 32.02); TEX. CODE CRIM. PROC. art. 32.02 ("The attorney representing the State may, by permission of the court, dismiss a criminal action at any time upon filing a written statement with the papers in the case setting out his reasons for such dismissal, which shall be incorporated in the judgment of dismissal. No case shall be dismissed without the consent of the presiding judge.").

[31] *Preston*, *supra* at 518.

requirement of affirmative action and trial court consent points to another characteristic of an abandonment that is true at least until the trial is over—it is purposeful. The State cannot inadvertently abandon a charging-instrument allegation, except perhaps by a failure to pursue it at trial at all and a resulting judgment for a lesser offense.

An analogous legal situation provides further support for our conclusion that this case involves neither the failure to join an allegation nor the abandonment of one: when a charging instrument is defective because it omits an element that raises the degree of the offense. In *Kirkpatrick v. State*, the indictment lacked an element necessary to make the offense a felony, but we held that the return of the indictment in district court and a felony notation on the indictment placed the defendant on notice that he was being charged with a felony offense rather than a misdemeanor.[32] So the indictment charged the felony offense, albeit defectively, and the defendant was required to object to the omission before the date of trial.[33] In *Teal v. State*, an indictment returned in district court specified that the defendant hindered the arrest of a person for the offense of Failure to Comply with Registration as a Sex Offender, which was a felony, but the indictment failed to specify that the defendant had knowledge of the fugitive's felony status.[34] The indictment included only one of the two elements needed to raise the offense to a felony. We concluded that the indictment was a defective indictment for the felony offense of hindering apprehension rather than a facially complete indictment for the misdemeanor offense.[35] Because it was a defective

---

[32] *See Kirkpatrick v. State*, 279 S.W.3d 324, 326, 329 (Tex. Crim. App. 2009).

[33] *Id.* at 329.

[34] 230 S.W.3d 172, 174, 181-82 (Tex. Crim. App. 2007).

[35] *Id.* at 182.

indictment, the defendant forfeited his claim by failing to object before the date of trial.[36]

The failure to read an aggravating element in the charging instrument is analytically similar, in relevant respects, to a charging instrument that omits an aggravating element but otherwise conveys notice of the aggravated offense. When an allegation that exposes the defendant to a greater punishment range is included in the charging instrument, and the State has not expressly abandoned it, the defendant is on notice of the allegation.[37] When that allegation is an element of the charged offense, the defendant would know, at the time the prosecutor reads from the charging instrument, that one of the elements of the charged offense was not read. At that time, the defendant is in a position to object to this incomplete reading of the charged offense. Having failed to do so, he forfeits error regarding the incomplete reading of the charging instrument.[38]

If that were not the law, then a case like *Kirkpatrick* could have been decided as a failure of the State to timely join issue on the felony offense, since, absent an objection from the defendant, the State would read the indictment as written, and that indictment would be missing the aggravating element.[39] But we are not aware of a single court decision that applies this late-joining theory to a

[36] *Id.*

[37] *Marshall*, 185 S.W.3d at 903 ("If the enhancements are in the indictment and the state does not abandon them, the defendant is on notice that the state is still seeking a greater penalty range.").

[38] The main analytical difference between the failure to read an element in the charging instrument and the omission of an element in the charging instrument is when a defendant is on notice of the problem. While the proper time to object to the omission of an element in the charging instrument is before the date of trial, the proper time to object to the failure to read an element is when a defendant is put on notice, i.e., at the time the charging instrument is read.

[39] In *Teal*, the defendant objected after the jury was empaneled, 230 S.W.3d at 182, and the opinion does not say whether the aggravating culpable mental state was included in the reading of the indictment to the jury. *Id.* at *passim*. The *Kirkpatrick* opinion does not say when the complaint

missing aggravating element of an offense—ever. Much less since *Kirkpatrick* (and *Teal*) were decided.

Further, if Appellant's theory could be applied to a *Kirkpatrick*-type situation, it is hard to see how it would not also apply to any missing element, even one needed to allege an offense at all. *Kirkpatrick* flows from a line of cases beginning with *Studer v. State*, holding that a missing element in a charging instrument is a defect that must be objected to pretrial.[40] *Kirkpatrick* does not accord special significance to defects that make a difference in the level of the offense. Quite the contrary, it negates the idea that such a defect should be treated any differently than the more run-of-the-mill missing element necessary to establish an offense at all.[41] Yet we are not aware of a single case applying a late-joining theory to such a missing element since *Studer* was decided over thirty years ago.

And with good reason. Such a theory has the potential to convert all claims of charging-instrument defects—which the constitutional and statutory provisions discussed in *Studer* meant to

---

was raised, so it might have been raised for the first time on appeal. *See* 279 S.W.3d at *passim*. If, as seems likely, the guilt-stage jury charge in *Kirkpatrick* correctly included the missing element, then the element would at worst be considered joined at the time the jury charge was read. *See Marshall*, 185 S.W.3d at 903 ("We observe that appellant had a 'reasonable time to examine' the charge of the court before the charge was read to the jury. He was then aware that the trial court proposed to submit an issue of fact that, in his view, had not been pleaded properly, i.e. the enhancement allegations that had not been included within the indictment or timely read to the jury. At that point, appellant should have objected, but he did not.").

[40] *See Studer v. State*, 799 S.W.2d 263, 268, 273 (Tex. Crim. App 1990) ("a failure to allege an element of an offense in an indictment or information is a defect of substance" and it is incumbent upon a defendant to object to such a defect before trial). *See also Kirkpatrick*, 279 S.W.3d at 327, 328 (citing *Studer*).

[41] *See* prior discussion of *Kirkpatrick*, *infra*.

foreclose absent a pretrial objection[42]—into failing-to-properly-join-charging-instrument-allegation claims. And doing so would reward late objections. Under Appellant's theory, by not objecting *until the punishment stage*, he could foreclose the State's ability to use the 0.15 allegation altogether. And applying that logic would allow a defendant to easily evade the holding in *Studer* by objecting as late as possible and then claiming on appeal that his complaint is not about the omission of an element in the charging instrument but, in fact, about the (unsurprising) failure of the prosecutor to read the element at trial. The law does not require that a defendant be afforded such a windfall.[43]

Consequently, we hold that when the State read the charging instrument, Appellant was on notice that the State had failed to read an allegation that Appellant believed to be an element of the offense. If the allegation was in fact an element, then the State's reading of the charging instrument was defective, and Appellant could have objected at that time. Having failed to do so, he forfeited any error in connection with the State's failure to read the allegation at the guilt stage of trial.

### D. Harm Analysis for Jury Charge Error

### 1. Jury Charge Error Remains

Even when a defendant has forfeited a defect in the charging instrument for omitting an element, the jury charge must still contain all the required elements of the offense.[44] So, if the jury charge also erroneously omits the element, then there is jury charge error, which must be evaluated

---

[42] *See Studer*, 799 S.W.2d at 268.

[43] Of course, a defendant who silently waits could be rewarded if the State fails to ever mention the 0.15 allegation and the trial court enters a judgment on the lesser offense of Class B misdemeanor DWI. But that is a gamble the defendant takes. We express no view on what would happen if the State purports to rely upon the allegation late but the trial court insists on sentencing on the Class B offense.

[44] *Sanchez v. State*, 209 S.W.3d 117, 119-20, 121-22 (Tex. Crim. App. 2006).

under the appropriate standard of harm.[45] The same would logically be true when the State fails to read an aggravating element from the indictment. The absence of the element from the jury charge would be jury charge error, subject to the appropriate standard of harm. We need not address the appropriate standard of harm in this case[46] except to hold that the error is not "structural," so some sort of harm analysis applies. Even applying the standard of harm that favors Appellant the most—that the error be shown to be harmless beyond a reasonable doubt—the error is harmless.

### 2. Not "Structural"

If an error is "structural," it is exempt from a harm analysis.[47] But only federal constitutional errors can be structural, and most are not.[48]

Ultimately, the State did read the 0.15 allegation—at the punishment stage of trial—and that allegation was found by the trial court to be proven. So, the errors implicated in this case are the

---

[45] *Id.*

[46] The federal constitution guarantees a right to a jury trial for any fact, other than a prior conviction, that increases the maximum penalty for a crime. *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000). If the error was preserved and the error was constitutional (but not "structural"), then the correct standard of harm is whether the error was harmless beyond a reasonable doubt. *Jimenez v. State*, 32 S.W.3d 233, 237 (Tex. Crim. App. 2000). If the error was preserved and the error was non-constitutional, then the correct standard of harm is whether the error "was calculated to injure the rights of defendant"—the "some harm" standard articulated in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *Jimenez*, 32 S.W.3d at 237. If the error was not preserved, then regardless of the nature of the error, the standard of harm is whether "it appears from the record that the defendant has not had a fair and impartial trial"—the *Almanza* standard of "egregious harm." *Id.* at 237-39. The right to a jury trial at guilt is a waivable-only right. *Oliva v. State*, 548 S.W.3d 518, 529 (Tex. Crim. App. 2018). Whether the waivable-only nature of the right extends to the omission of an element from the jury's consideration and, if so, whether that affects the harm analysis under *Almanza* are issues that we need not address today.

[47] *See Schmutz v. State*, 440 S.W.3d 29, 35 (Tex. Crim. App. 2014).

[48] *Id.*

defendant's right to have an element of the offense decided at the guilt stage of trial and his right to have that element decided by a jury. The right to have an element decided at the guilt stage of trial is a creature of state statute. "The conceptualization of criminal offenses is mostly left to the states" and "involves balancing and rebalancing over time complex and oft-competing ideas about 'social policy' and 'moral culpability'—about the criminal law's 'practical effectiveness' and its 'ethical foundations.'"[49] Although due process protects the "right not to be convicted on proof of less than the elements of the crime,"[50] that right was not at issue here because Appellant was found to have committed all of the elements of Class A misdemeanor DWI, and he was not subject to the Class A misdemeanor punishment range until he was found to have committed the aggravating element needed to invoke that punishment range. And in *Neder v. United States*, the Supreme Court held that the denial of the federal constitutional right to a jury trial on a single element of an offense is not structural error.[51]

### 3. Harmless under "Beyond a Reasonable Doubt" Standard

For preserved constitutional error that is not structural, the correct standard of harm on direct appeal is, ordinarily, that the error is harmless if the court can determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment."[52] The Supreme Court has held that this harm standard applies to the omission of an "element" of the offense from the jury instructions

---

[49] *Kahler v. Kansas*, 140 S. Ct. 1021, 1028 (2020) (brackets and some internal quotation marks omitted) (state could decline to recognize 'moral' version of insanity defense and allocate it as a punishment issue).

[50] *Taylor v. State*, 109 S.W.3d 443, 451 (Tex. Crim. App. 2003).

[51] 527 U.S. 1, 8-15 (1999).

[52] TEX. R. APP. P. 44.2(a). *See also Neder*, *supra* at 7.

in violation of the constitutional right to a jury trial.[53] In *Neder*, the Court held that harmlessness is shown beyond a reasonable doubt when "an omitted element is supported by uncontroverted evidence . . . where [the] defendant did not, and apparently could not, bring forth facts contesting the omitted element."[54]

The court of appeals concluded that the breath test results did not go uncontested, but its support for that conclusion is, upon close examination, insubstantial. The statute provides that the 0.15 allegation is proven if "an analysis of a specimen of the person's blood, breath, or urine showed an alcohol concentration level of 0.15 or more at the time the analysis was performed."[55] We have observed that "this additional statutory requirement only requires that the State prove that the defendant had an alcohol concentration level of at least 0.15 at the time the analysis was performed."[56]

Here, the test results themselves were uncontroverted despite the efforts of trial defense counsel to show that Appellant was not intoxicated. It was uncontroverted and incontrovertible that the breath-test machine returned results on two breath samples that were greater than 0.15. In closing argument to the jury, defense counsel contended that the technical supervisor's disparity in testimony in two different proceedings about when the breath test started cast doubt on the reliability

---

[53] *Neder*, *supra* at 15-16. As noted earlier, any fact, other than a prior conviction, that increases the maximum punishment is considered an "element" for the purpose of the constitutional right to a jury trial, regardless of whether that fact is an offense element under state law. *Apprendi*, 530 U.S. at 476.

[54] 527 U.S. at 18-19.

[55] TEX. PENAL CODE § 49.04(d).

[56] *Ramjattansingh v. State*, 548 S.W.3d 540, 548 (Tex. Crim. App. 2018).

of the test, and the court of appeals agreed, finding the technical supervisor's statements to be inconsistent.[57]

But all the disparity shows is that the technical supervisor gave slightly incorrect information in the ALR affidavit about when the breath test began—the witness's error in recalling a time stamp from the machine. This slight error in recalling the time stamp does not show anything wrong with how the test itself was conducted, and in fact, the technical supervisor testified that the test was valid and had not been subjected to radio interference. And since the technical supervisor did not conduct the breath test, her inaccuracy in the ALR affidavit cannot possibly reflect on the competence of the technician who administered the test or the test results themselves. Because no flaws in the lab procedures were shown, the 0.15 allegation was in fact uncontroverted.

Trial counsel and the court of appeals also suggested that the 0.15 analysis was controverted because Appellant's speech and mannerisms seemed inconsistent with being "highly intoxicated." This was also not evidence that controverted the test results. Breath testing conducted according to proper procedures reflected results significantly over .15 (0.194 and 0.205). Observational evidence that the defendant's speech and mannerisms seemed inconsistent with being highly intoxicated is simply not controverting evidence with respect to the test results.[58] With no evidence that the

---

[57] Defense counsel's closing argument characterized the disparity as being five minutes, but it appears to have been just one minute. Defense counsel argued that the disparity was between the start time in the ALR affidavit and the first breath result testified to at trial—a five minute disparity, 11:55 p.m. versus midnight. But the technical supervisor testified at trial that the start time for the test was not the first breath result but the operational system check—which, when compared to the ALR affidavit, produces only a one minute disparity, 11:55 p.m. versus 11:56 p.m.

[58] *See supra* at n.55 and accompanying text. Even if observational evidence could rebut a breath-test result taken in accordance with proper procedures, the observational evidence was not particularly persuasive in this case. The technician who conducted the breath test and watched the field-sobriety tests merely agreed that Appellant's speech and mannerisms were inconsistent with

Intoxilyzer test itself was flawed, it is uncontroverted that "an analysis of a specimen of the person's blood, breath, or urine showed an alcohol concentration level of 0.15 or more at the time the analysis was performed," as required by the statute.

Because the record shows that the test results were uncontroverted and indicates that the defense could not in fact controvert those results, any error in failing to submit the 0.15 allegation to the jury was harmless beyond a reasonable doubt.

We reverse the judgment of the court of appeals and remand the case to that court to address Appellant's remaining point of error.

Delivered: September 29, 2021

Publish

---

someone "presumed" to be highly intoxicated. He also agreed that everyone shows intoxication differently and that a person could be intoxicated and speak normally. Moreover, the technical supervisor testified that someone who produced a 0.20 breath result could show the variety of impairments posited by defense counsel but that everyone showed intoxication differently and that she could not say that any of those impairments had to be associated with 0.20 breath result. She also testified about the concept of tolerance, which would allow a habitually heavy drinker to not show symptoms that might be associated with intoxication in an average person. And Appellant failing two field-sobriety tests—the one-leg-stand and walk-and-turn tests—seriously undermines any claim that he was not highly intoxicated. In any event, the legislature's framing of the 0.15 aggravating element appears designed to avoid the consideration of observational evidence, perhaps for the very reasons supplied by the expert testimony in this case—that observational evidence is not particularly probative because people show intoxication differently and tolerance can allow an intoxicated person to mask symptoms.