

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00091-CR

Eric Laranze **TAYLOR**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2020CR3024
Honorable Jennifer Peña, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Irene Rios, Justice
                Beth Watkins, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: August 14, 2024

AFFIRMED

Eric Laranze Taylor appeals his convictions for continuous trafficking of persons and aggravated promotion of prostitution, raising sufficiency, jury charge, and confrontation claims. We affirm.

## BACKGROUND

On September 13, 2018, at 11:30 p.m., the Bexar County Sheriff's Office executed a search warrant at the MGM Cabaret, an all-hours, bring-your-own-alcohol, fully nude strip club. Deputies controlled traffic and detained everyone in the club and its parking lot. A few hours later, and

despite the continued presence of police cars, Taylor drove into the club's parking lot. Sergeant Rey Salinas smelled marijuana when he approached Taylor, and asked Taylor to step out of his car. Taylor provided his identification and said that he had picked up his passenger, K.M., at AllStars, another strip club.

K.M. provided a California driver's license showing she was twenty-two years old. Salinas brought K.M. to a female deputy, Marquita Hunt. When Hunt asked how old she was, she said she was seventeen; Hunt later learned she was sixteen. Deputies searched Taylor's car but did not find any marijuana and let Taylor leave. Because K.M. was a juvenile, she could not leave with him.

K.M. would not provide Hunt with contact information for any family members, so Hunt took her to a shelter for at-risk youth. Hunt observed staff checking K.M.'s property for contraband—she had "several G-string type panties, bra tops, high-heeled shoes, condoms, wet wipes," and more than $600 in cash.

After an investigation, Hunt learned K.M. had used the California driver's license to work as a stripper at various clubs, including AllStars and Blush, that required employees to be at least eighteen years old. A week later, Hunt learned that K.M. had been reported as a runaway and began looking for her. She went to the address Taylor provided at the MGM and saw his car in the parking lot. Hunt knocked on the door for several minutes but no one answered. She waited in the parking lot, and eventually K.M. and an eighteen-year-old, C.G., walked out of the apartment to meet an Uber. Hunt allowed C.G.to leave but took K.M. to the Sheriff's Office. Other deputies spoke to Taylor inside his apartment, and he agreed to be interviewed at the Sheriff's Office.

Hunt interviewed K.M. and collected her phone while Detectives Easter and Lugo spoke with Taylor. He gave them consent to search his phone. Task Force Officer Mike Allen copied the contents of the phone and returned it to Taylor. After talking with Easter and Lugo, Taylor asked to speak with Hunt. He told Hunt that K.M. came to live with him about six weeks after he met

her at AllStars, and that she stayed with him for three to four months. Taylor admitted having sex with K.M. but said he learned she was not twenty-two at the same time Hunt did—September 13 at the MGM. He stated that they went to the MGM so late that night because it was an after-hours club. Taylor initially denied, but later admitted, that he picked up K.M. after she left the shelter and took her back to his apartment. He said he was trying to arrange her trip home to Amarillo, but she did not want to leave. At the end of the interviews and a physical exam, Taylor went home.

Over the next two days, and pursuant to warrants, deputies arrested Taylor and searched his apartment. They found several forms of identification in the pocket of a jacket, including: credit cards bearing the name D.J.; Tennessee driver's licenses with Taylor's name on them; a California license for N.G. (but bearing the photo of S.A.); a Texas driver's license for C.M.; a social security card for C.C.; a health receipt belonging to K.M.; a blank application for employment at a strip club; and tax paperwork and a birth certificate for A.C. They also found high heels, bikini tops, very short tops, and thong underwear.

On October 15, 2018, Hunt returned K.M.'s phone. K.M.'s parents did not know she was in San Antonio. Hunt again took K.M. to the shelter. This time, K.M. had $1,600 in cash.

Hunt and Texas Alcoholic Beverage Commission Agent Christopher Teague went to Amarillo to interview several people, including S.A. and S.C., both of whom were under the age of eighteen. They also talked to K.M. again. They obtained consent to search the minors' phones. They learned the Facebook names and identifiers on accounts for Taylor, K.M., and multiple other females, including S.A., S.C., and D.J. They obtained a warrant to view the content of their Facebook communications. In conversations with S.A., S.C., and other females, some of whom were under eighteen, Taylor encouraged the females to live in his apartment and work for him. He offered them fake identification cards and transportation. Teague obtained records from several

strip clubs—including in San Antonio, Austin, Round Rock, and Houston—showing females used those fake identifications to apply for and work as strippers at the strip clubs.

Hunt presented the evidence to the district attorney's office, and a grand jury indicted Taylor on charges of continuous trafficking of persons and aggravated promotion of prostitution. The jury convicted Taylor on both counts and assessed punishment at thirty-five years on the continuous trafficking count and fifteen years on the aggravated promotion of prostitution count. Taylor now appeals.

## ANALYSIS

### *Sufficiency*

In his first two issues, Taylor argues the evidence is insufficient to support his convictions.

### *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Under that standard, we examine all the evidence in the light most favorable to the verdict and resolve all reasonable inferences from the evidence in the verdict's favor to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). "[N]o evidence is ignored because the standard requires a reviewing court to view all of the evidence in the light most favorable to the verdict." *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016) (internal quotation marks and emphasis omitted). "An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Rather, "[a] court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id*. This rationality requirement is a key and explicit component of the *Jackson* sufficiency standard. *See Jackson*, 443 U.S. at 319.

*1. Sufficiency to Prove Continuous Trafficking of Persons*

"'Traffic' means to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." TEX. PENAL CODE ANN. § 20A.01(4). "A person commits [trafficking of persons] if the person knowingly . . . traffics a child . . . and by any means causes the trafficked child . . . to engage in, or become the victim of, conduct prohibited by," inter alia, the statutory crimes of sexual assault, prostitution, compelling prostitution, or employment harmful to children. TEX. PENAL CODE ANN. § 20A.02(a)(7)(C), (E), (H), (J). "A person commits [continuous trafficking of persons] if, during a period that is 30 or more days in duration, the person engages two or more times in conduct that constitutes an offense under Section 20A.02 against one or more victims." TEX. PENAL CODE ANN. § 20A.03(a).

The continuous trafficking of persons count alleged that, during a period that was 30 or more days in duration, from around March 1, 2016 through October 15, 2018, Taylor engaged two or more times in conduct that constitutes trafficking:

> 1. the defendant knowingly trafficked [B.S.], a child, and by any means, caused [B.S.] to engage in and become a victim of conduct prohibited by Section 43.05 (Compelling Prostitution), Section 43.02 (Prostitution), and Section 22.011 (Sexual Assault)

> 2. the defendant knowingly trafficked [K.M.], a child, and by any means, caused [K.M.] to engage in and become a victim of conduct prohibited by Section 43.05 (Compelling Prostitution), Section 43.02 (Prostitution), Section 22.011 (Sexual Assault), and Section 43.251 (Employment Harmful to Children)

> 3. the defendant knowingly trafficked [S.C.], a child, and by any means, caused [S.C.] to engage in and become a victim of conduct prohibited by Section 22.011 (Sexual Assault), and Section 43.251 (Employment Harmful to Children)

> 4. the defendant knowingly trafficked [S.A.], a child, and by any means, caused [S.A.] to engage in and become a victim of conduct prohibited by Section 43.251 (Employment Harmful to Children)

Taylor argues the evidence is insufficient to show that the alleged trafficking occurred during a period that was 30 or more days in duration. He notes that of the four juveniles the State

alleged he trafficked, only B.S. testified at trial, and she was only with Taylor for two to three weeks. He argues the hearsay evidence the jury heard—K.M.'s statements to Hunt and Teague that Taylor was her pimp and that he arranged her transportation to the strip clubs where she worked—was insufficient to establish that he trafficked K.M. "during a period of 30 or more days in duration." He further contends the evidence is insufficient to prove that he trafficked S.C. and S.A. at all. And, he claims, "the state of the evidence was such that the jury could only speculate as to when the alleged trafficking occurred." Our sufficiency review of "all the evidence" includes both properly and improperly admitted evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury received evidence that the alleged trafficking occurred during a period that was 30 or more days in duration.

**B.S.** (compelling prostitution, prostitution, sexual assault) testified under immunity. She explained that she met Taylor on Facebook in March of 2016, and he recruited her, promising she "could join his team" and "that he already had some girls that were working for him," and showing her "a stack of cash." Taylor wanted to be her "pimp." She was sixteen years old, so she had to get a "fake ID" to work in the clubs. Taylor's "other girl," "Goldie," trained B.S. how to talk on the phone to customers responding to Backpage ads. She spent "maybe a few weeks" in March 2016 working for Taylor by taking 70–80 "in calls." The fee was based on time and the acts included oral sex and intercourse. She explained that the customers "would come to the hotel. . . . They'd leave the money on the dresser. We'd do our business, and then . . . [Taylor] would come pick up the money from me." He provided her with "sex and marijuana." She thought Taylor would do more for her and when she realized he was not going to, she decided to end their "business relationship."

**K.M.** (compelling prostitution, prostitution, sexual assault, employment harmful to children) did not testify. In her interview with Teague, K.M. explained that Taylor was her pimp—

he demanded that she make money for him through stripping and prostitution, and that she recruit other females to work for him, stripping and prostituting. Teague testified his investigation showed that K.M. used various fake identification cards, including the California license she had at the MGM, to get jobs working at clubs in San Antonio, Austin, Round Rock, and Houston. Records from those clubs documented her working between June 2018 and October 2018. At most of these clubs, she gave Taylor's name and number as her emergency contact. Teague testified records from the Austin Wyndham Hotel showed that Taylor rented a room there when K.M. worked in nearby Round Rock. Photos and videos from K.M.'s phone depict her counting money and working at a strip club. K.M. had skimpy and sexually suggestive clothing, condoms, and more than $600 in her duffle bag the first time Hunt took her to the shelter, and $1,600 the second time. Bus records showed that after K.M. arrived in San Antonio, Taylor bought her multiple bus tickets to travel between San Antonio, Lubbock, and Amarillo. In his interview with Hunt, Taylor admitted having a sexual relationship with K.M., who was sixteen.

**S.C.** (sexual assault, employment harmful to children) did not testify. But the trial court admitted records that supported a reasonable inference that Taylor facilitated her underage work at a strip club, including that Taylor paid for her fake identification, which was made with a photo she sent him. She worked at Blush and AllStars. In August and September 2018, Taylor bought her bus tickets for travel between Amarillo, Dallas, and San Antonio.

**S.A.** (employment harmful to children) did not testify. Again, though, the jury reviewed records that supported a reasonable inference that Taylor facilitated her underage work at a strip club. Specifically, in July 2018, Taylor told S.A., then sixteen, that he could get her a fake identification card to work in a strip club. Deputies found her fake identification card at Taylor's apartment. Records from Blush showed she worked there along with D.J., and photos showed her, K.M., and D.J. working at Blush in July 2018. In July 2018, Taylor bought her a bus ticket.

In sum, the State presented considerable evidence that, when viewed in the light most favorable to the verdict, supports the conviction for continuous trafficking. Under the statute, "members of the jury are not required to agree unanimously on which specific conduct engaged in by the defendant constituted an offense under Section 20A.02 or on which exact date the defendant engaged in that conduct." TEX. PENAL CODE § 20A.03(b). Instead, "[t]he jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, engaged in conduct that constituted an offense under Section 20A.02." *Id*. Even setting aside the testimony of B.S., jurors were presented with ample evidence that, in 2018, during a period that was "30 or more days in duration," Taylor engaged in conduct that constituted an offense under Section 20A.02—he committed "employment harmful to children" by inducing K.M., S.C., and S.A., who were children under eighteen, to work as strippers in the sexually oriented commercial activity of strip clubs. TEX. PENAL CODE ANN. § 43.251(b)(1) (a person commits employment harmful to children if the person "induces a child to work . . . in a sexually oriented commercial activity"). A fourth female, D.J., testified that Taylor transported them to their work shifts at strip clubs. TEX. PENAL CODE §§ 20A.01(4), 20A.02(a)(7). Although Taylor complains about the volume of hearsay the State relied upon in proving its case, we are obligated to review "all of the evidence." *Clayton*, 235 S.W.3d at 778 (sufficiency review "includes evidence that was properly and improperly admitted"). And we do not believe the jury acted irrationally in relying on this hearsay evidence, especially because it was corroborated by voluminous non-hearsay including Taylor's social media statements and photographs. *Nisbett*, 552 S.W.3d at 262; *see also* TEX. R. EVID. 801(e)(2) (party's own statements offered against him are not hearsay). We therefore overrule Taylor's first issue.

*2. Sufficiency to Prove Aggravated Promotion of Prostitution*

Next, Taylor argues the evidence is insufficient to establish that he committed aggravated promotion of prostitution. "A person commits [aggravated promotion of prostitution] if he

knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes." Tex. Penal Code Ann. § 43.04(a). Article 21.02(6) of the Texas Code of Criminal Procedure provides that, in an indictment, "[t]he [offense date] mentioned must be some date anterior to the presentment of the indictment, and not so remote that the prosecution of the offense is barred by limitation." Tex. Code Crim. Proc. Ann. art. 21.02(6). The indictment alleged that "on or about the 9th Day of August, 2018, ERIC LARANZE TAYLOR, did knowingly own, invest in, finance, control, supervise, and manage a prostitution enterprise that used at least two prostitutes[.]" "[T]he 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). The jury charge repeated that "on or about" date.

Taylor argues the evidence is insufficient to prove that he managed two or more prostitutes or that he did so within three years of the March 25, 2020 indictment. *See* Tex. Code Crim. Proc. Ann. art. 12.01(9) (felony indictment for offenses alleged here may be presented within three years from the date of offense). We will assume, without deciding, that we cannot consider evidence from before March 25, 2017 in determining whether sufficient evidence supports the jury's finding on aggravated promotion of prostitution. As discussed above, K.M. told Teague and Hunt that during the summer of 2018, Taylor was her pimp. She explained that "[h]e demanded she make so much money through stripping and prostituting. . . . He had her recruit other girls to come to San Antonio and work for him, stripping and prostituting."

In addition, D.J. testified she decided to come to San Antonio after K.M. told her she could make money stripping there. Taylor picked her up from her mother's house in Karnes City when she was eighteen. Taylor bought her clothes at a "stripper store." She would stay in his apartment

when working, and then return to Karnes City. S.A. and K.M. stayed at the apartment too, and D.J. worked with them at Blush. D.J. testified that none of them had a car, so Taylor drove them to and from various strip clubs. At the end of a shift, she would give all her money to Taylor. In exchange, Taylor was "going to take care of us. . . . Make sure we were fed and make sure we had, like, basic needs, like food, clothes, shelter, stuff like that."

D.J. testified Taylor wanted her to engage in prostitution to make "like 500 a day." She testified she never had sex with men for money, though Taylor encouraged her to and she attempted to. But D.J.'s testimony on this point was impeached—Teague testified that when he and Hunt interviewed D.J., she admitted engaging in sex with men for money for Taylor.

August 23, 2018 communications between Taylor and S.C. showed Taylor directing S.C. on how to handle a client—"You need to finesse and get more. . . . If he's willing to give you 3, he's willing to give you 6."

Finally, as the State documents in its brief, Taylor consistently recruited for his enterprise via Facebook conversations and messages. Among excerpts of the State's exhibits that Teague read out loud, the jury heard Taylor's words, including:

- "I'm a pimp, not a trick. I'm looking for a real one."

- "A few of my old hoes there now trying to get me to come back, Chandler/Scottsdale area. . . ."

- "Bitch, all my hoes foreign. . . . Like I said, if you knew better, you'll truly do better. Bitch, you not getting no real money if you don't have at least 100 bands."

- "That's why you truly need to make me daddy and truly show you the way, bring you way up to standards. I will get you to me and make sure you're well taken care of. Are you willing to dance in clubs allowing me to show you how to get 6 to 1,000 a night, putting you in a better position?"

- "But you going to be dancing in the clubs, finessing these tricks out a bag. I'm not about to force you to do anything you're not comfortable with. I don't expect you to be quick to fuck every trick for some money."

- "You're never going to worry about anything. I can promise you that I'm going to make sure you don't want for anything. Yes, you will be satisfying – you will be staying with me, definitely going to be eating and smoking good, all that."

The evidence supported a reasonable inference that Taylor supervised an enterprise consisting of at least K.M., D.J., and S.C., who were engaging in prostitution, and that he was working to recruit additional prostitutes. TEX. PENAL CODE § 43.04(a) (requiring the enterprise consist of two or more prostitutes); *see Williams v. State*, 668 S.W.3d 59, 65 (Tex. App.—San Antonio 2022), *rev'd on other grounds*, 685 S.W.3d 110 (Tex. Crim. App. 2024) (evidence, including details of communications, sufficient to support defendant's conviction for aggravated promotion of prostitution). We therefore overrule Taylor's second issue.

### Jury Charge Error

In his third and fourth issues, Taylor argues errors in the court's charge resulted in egregious harm.

#### Applicable Law and Standard of Review

The trial court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14. "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995) (internal citation omitted). "The application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). "Because that paragraph specifies the factual circumstances under which the jury should convict or acquit, it is the 'heart and soul' of the jury charge." *Id*. at 367. The "law applicable to the case" also includes "the statutory definitions that affect the meaning of the elements of the offense." *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011).

"Our first duty in analyzing a jury-charge issue is to decide whether error exists." *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the charge contains error, we analyze that error for harm. *Id*. If, as here, the appellant did not object to the error in the charge, the error requires reversal only if we find egregious harm. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). "Under *Almanza*, reviewing courts should consider the following four factors: 1) the charge itself; 2) the state of the evidence including contested issues and the weight of the probative evidence; 3) arguments of counsel; and 4) any other relevant information revealed by the record of the trial as a whole." *Olivas*, 202 S.W.3d at 144.

### 3. Omission of "During a Period that is 30 or More Days in Duration" Element of Continuous Trafficking of Persons

Taylor argues the trial court erred in omitting the "during a period that is 30 or more days in duration" language from the application section of its charge. The State concedes—and we agree—that this was error. *See Niles v. State*, 555 S.W.3d 562, 572 (Tex. Crim. App. 2018) (failure to charge on element of offense is error); *Williams v. State*, 662 S.W.3d 452, 459 (Tex. Crim. App. 2021) (continuous trafficking requires proof that defendant, "'during a period that is 30 or more days in duration,' engaged 'two or more times in conduct that constitutes' trafficking"). Because Taylor did not object to this missing element, we review the record for egregious harm. *Olivas*, 202 S.W.3d at 144.

**The charge itself.** Although the application paragraph failed to set out the "during a period that is 30 or more days in duration" element, it did contain the March 1, 2016 to October 15, 2018 range alleged in the indictment. And the charge included the "during a period that is 30 or more days in duration" element in the abstract section—once on the first page of the charge setting out

the language of section 25.072(a), and again on the page setting out section 20A.03(b)'s unanimity requirement. This unanimity requirement appeared two pages before the application section of charge. Given this presence of the phrase, we doubt the jury would have misunderstood the task at hand. *See Vasquez*, 389 S.W.3d at 371 (omission of definition in application paragraph ameliorated by its inclusion in the immediately preceding abstract charge); *Riley v. State*, 447 S.W.3d 918, 926 (Tex. App.—Texarkana 2014, no pet.) ("We are convinced, primarily by the state of the evidence on robbery, that the harm from the lack of a robbery element in the [capital murder] charge was not egregious.").

**The state of the evidence including contested issues and the weight of the probative evidence.** As discussed above, the evidence was sufficient to prove trafficking during a period that was 30 or more days in duration. Even if, as Taylor asserts, the evidence does not show that he trafficked B.S. for a period that lasted 30 days or more, that is not fatal to the State's case given the evidence of Taylor's actions in 2018. The evidence supported a conclusion that, over the span of many consecutive months in 2018, Taylor knowingly transported, enticed, recruited, harbored, and provided for at least three children and caused those children to engage in employment harmful to them in strip clubs.

**The arguments of counsel.** Defense counsel focused at times on the failure of the State to prove he committed two trafficking offenses during a period that was 30 or more days in duration:

- "And what did [B.S.] say? She was with [Taylor] for no more than two to three weeks in her written statement and then again on the stand. And that doesn't go beyond 30 days, which is what you have to consider."

- "So, how are they going to prove the rest of those three paragraphs? Because they can't prove the first paragraph with [B.S.]. With statements of bus records, bus tickets, Wells Fargo, text messages, Facebook messages that they claim are from [Taylor] to these girls soliciting them, asking them to get together, compelling them to do prostitution? But you've heard no testimony to corroborate those statements, to authenticate those statements."

- "And the only girl they brought in, [B.S.], stated that she was only with [Taylor] for two to three weeks."

The State responded:

- "So, your role here in deciding whether [] Taylor trafficked [K.M., B.S., S.A., and S.C.], was did [Taylor] on more than one occasion -- on more than one occasion over a 30-day period cause any of those girls to be employed at a strip club? And you know the answer to that. You know that he did. You can see it."

- "So, you only need to pick one instance. Some of you may believe, yeah, he trafficked [B.S.] one time in 2016, and he trafficked [K.M.] one time in 2018 by having sex with her. Okay? That's two times. That's over 30 days. And in the course of that, he harbored and transported -- or harbored or transported or recruited them. Okay? That's continuous trafficking alone, right? Or you could believe, because the evidence shows, that just with [K.M.] -- that he was guilty of continuous trafficking just in relation to his contact with her. How do we know that? Even though [K.M.] is not here, how do we know that? Because we know [K.M.] told Investigator Teague on October 18th and Sergeant Hunt that she'd been with [Taylor] since February of 2018 stripping, having sex with him regularly. He'd give her marijuana. He'd buy her clothes. He'd do her nails. He'd do her hair. He took her to the dates and provided Ubers and Lyfts for her, and she was making money with him. And you heard from the Defendant. He claims he gave her -- she gave him a sexually-transmitted disease. Okay? So, just with [K.M.], he was with her for over 30 days."

These arguments explicitly informed the jury that it could not convict Taylor of continuous trafficking unless it found the State had proved he committed two trafficking offenses during a period that was 30 or more days in duration. Although these express statements of law came from defense counsel and the prosecutor, not the court's instructions, the abstract instructions included the "during a period that is 30 days or more in duration" element, and no one suggested the parties' representations were incorrect or incomplete. *See Olivas*, 202 S.W.3d at 148 (considering possible harm from missing instruction on State's burden and noting ameliorative effect of counsel's reference to burden).

**Conclusion.** After reviewing the relevant factors, we conclude the errors about which Taylor complains did not affect the very basis of the case, deprive him of a valuable right, or vitally

affect his defensive theory. *Marshall*, 479 S.W.3d at 843. The record in this case does not support a finding of egregious harm. We therefore overrule Taylor's third issue.

### 4. Definition of "Prostitution Enterprise"

Taylor argues the trial court erred in including a definition of "prostitution enterprise" in the jury charge because it is not a statutorily defined term.

### Applicable Law

"To ensure compliance with Article 36.14, a trial judge should, as a general rule, avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence." *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019). "[S]pecial, non-statutory instructions, even when they relate to statutory offenses or defenses, generally have no place in the jury charge." *Walters v. State*, 247 S.W.3d 204, 211 (Tex. Crim. App. 2007). This includes instructions defining undefined statutory terms. *Grotti v. State*, 273 S.W.3d 273, 281 (Tex. Crim. App. 2008). A juror can assign an undefined statutory term any meaning acceptable in common parlance. *Kirsch v. State*, 357 S.W.3d 645, 652 (Tex. Crim. App. 2012). Nevertheless, "a jury charge may properly include definitions for non-statutorily defined terms that have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a well-known common law meaning." *Beltran De La Torre*, 583 S.W.3d at 618 (internal quotation marks omitted).

### Application

Again, a person commits the offense of aggravated promotion of prostitution "if he knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes." TEX. PENAL CODE § 43.04(a). The Texas Penal Code contains a definition for "prostitution" but not for "enterprise" or "prostitution enterprise." *See* TEX. PENAL

CODE ANN. § 43.01(2) (setting out definitions, defining prostitution as "the offense defined in Section 43.02"). Section 43.02 currently defines prostitution as "knowingly offer[ing] or agree[ing] to receive a fee from another to engage in sexual conduct." TEX. PENAL CODE ANN. § 43.02(a). Here, the court's charge instructed, "'[p]rostitution enterprise' means a plan or design for a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return for a fee payable to them." Taylor argues this definition "focused the jury's attention on the type of evidence that may have supported a finding of prostitution enterprise and thus impermissibly guided the jury's understanding of 'prostitution enterprise.'" The State argues that the term has acquired a legal meaning that differs from its common usage, so the trial court properly included the definition.

In the 1970s, the Texas Court of Criminal Appeals defined "prostitution enterprise" for purposes of a sufficiency review. *Taylor v. State*, 548 S.W.2d 723, 723 (Tex. Crim. App. 1977). It looked to the Penal Code's definition of "prostitution" and Webster's Third New International Dictionary definition of "enterprise." *Id*. Combining these definitions, it described a "prostitution enterprise" as "a plan or design for a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return for a fee payable to them." *Id*. This is the definition the trial court gave the jury in Taylor's case.

The Court of Criminal Appeals later referred to this *Taylor* definition when it rejected an argument that, because "prostitution enterprise" is capable of various meanings, article 43.04 was unconstitutionally vague. *Floyd v. State*, 575 S.W.2d 21, 23 (Tex. Crim. App. [Panel Op.] 1978). The court noted that, in *Taylor*, it had applied the rule of statutory construction that "words defined in dictionaries and with meanings so well known as to be understood by a person of ordinary intelligence are not to be considered vague and indefinite." *Id*. The court subsequently referenced the *Taylor* definition in holding that the lack of such a definition in a charging instrument did *not*

render that instrument defective because "prostitution" is defined in the Penal Code and the word "enterprise" is one of common usage. *Ringer v. State*, 577 S.W.2d 711, 714 (Tex. Crim. App. [Panel Op.] 1979); *see also Armentrout v. State*, 645 S.W.2d 298, 302 (Tex. Crim. App. 1983) (using definition in sufficiency review). Since then, trial courts have given the *Taylor* definition in jury instructions. *See Smithwick v. State*, 762 S.W.2d 232, 234 (Tex. App.—Austin 1988, pet. ref'd); *Branch v. State*, 497 S.W.3d 588, 590 (Tex. App.—Eastland 2016, no pet.).

In defining the term "prostitution enterprise" as "a plan or design for a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return for a fee payable to them," the trial court selected a single definition of a statutorily undefined, ordinary term and instructed the jury that it was controlled by that definition. *See Kirsch*, 357 S.W.3d at 651–52; *Green v. State*, 476 S.W.3d 440, 444 (Tex. Crim. App. 2015). Although the definition of "prostitution enterprise" set forth in the charge is an appropriate tool for an appellate court's sufficiency review, instructing the jurors to use that definition in this case impermissibly channeled their understanding of the term. *See Kirsch*, 357 S.W.3d at 652. The jury should have been free to assign the term any common meaning. *See Beltran De La Torre*, 583 S.W.3d at 618–20 (jury properly charged on statutory definition of possession, "and it was not for the trial court to add to the Legislature's definition by supplementing it with an instruction on joint possession").

Taylor did not object to the non-statutory instruction, so we again review the record for egregious harm. *Olivas*, 202 S.W.3d at 144. Taylor argues the instruction was egregiously harmful because the sole contested issue was whether the State proved a "prostitution enterprise." But several factors inform whether a jury charge error is egregiously harmful, and we are obligated to consider all of them.

**The charge itself.** First, the application paragraph did not incorporate the non-statutory definition. Second, the jury was correctly charged on the two statutory definitions of prostitution

applying to offenses committed both before and after September 1, 2017. While the "prostitution" part of the trial court's "prostitution enterprise" definition ("offer to, agree to, or engage in sexual conduct in return for a fee payable to them") departed from those definitions, it did not contradict them. Acts 2017, 85th Leg., ch. 685 (H.B. 29), §§ 36, 37, 44(2), eff. Sept. 1, 2017 Acts 2017, 85th Leg., ch. 1038 (H.B. 1808), § 8, eff. Sept. 1, 2017; Acts 2015, 84th Leg., ch. 332 (H.B. 10), § 14, eff. Sept. 1, 2015 Acts 2015, 84th Leg., ch. 1273 (S.B. 825), § 1, eff. Sept. 1, 2015.

**The state of the evidence including contested issues and the weight of the probative evidence.** As detailed above, the State's evidence supported a reasonable inference that Taylor acted as a pimp for B.S., K.M., D.J., and S.C., and that he was working to recruit more females. And B.S.'s testimony concerning Taylor's 2016 conduct constituted probative evidence of Taylor's intent with K.M., D.J., S.C., and those he tried to recruit.

**The arguments of counsel.** Neither party focused on what a "prostitution enterprise" is. Defense counsel used the word "enterprise" in encouraging the jury to question the evidence that Taylor was running an enterprise. Similarly, the State used the word "enterprise" in summarizing the evidence that a strip club is a "sexually-oriented commercial enterprise."

**Conclusion.** After reviewing the relevant factors, we find that the definition did not affect the very basis of the case, deprive Taylor of a valuable right, or vitally affect his defensive theory, and so did not cause egregious harm. *See Marshall*, 479 S.W.3d at 843. We therefore overrule Taylor's fourth issue.

### *Confrontation Clause*

In his fifth and sixth issues, Taylor argues the trial court violated his rights under the Confrontation Clause when it admitted texts, messages, and photos the State extracted from his and K.M.'s cell phones.

*Applicable Law and Standard of Review*

The Sixth Amendment "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (internal quotation marks omitted). Statements "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "[S]tatements to individuals who are not law enforcement officers could conceivably raise confrontation concerns" but "such statements are much less likely to be testimonial than statements to law enforcement officers." *Clark*, 576 U.S. at 246. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.* at 245 (internal quotation and alteration marks omitted). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). We review de novo a constitutional legal ruling on whether a statement is testimonial or not. *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006).

*5. Contents of K.M.'s Cell Phone (State's Exhibits 75A and 77)*

Pursuant to a search warrant, Officer Allen conducted a forensic search of K.M.'s cell phone using Cellebrite software. State's Exhibit 77 is the Cellebrite extraction report. Short videos were culled from the extracted data and introduced, with the audio removed, as State's Exhibit 75A. The trial court admitted the evidence over Taylor's confrontation objection, making "clear for the record that there is no audio on that exhibit at all." The trial court also specifically confirmed that there was no text messaging within the clips before they were shown.

The videos admitted showed:

- Taylor, shirtless, rolling a cigarette;

- K.M. dressed in skimpy and sexually suggestive clothing while handling large amounts of cash in a bucket;

- Taylor in his car showing a gun to a man outside his window;

- K.M. laying her head on Taylor's bed;

- K.M. and Taylor in a car with Taylor showing off a pile of cash;

- hands counting a stack of money;

- K.M. counting a large stack of money;

- Taylor sitting in a booth in a restaurant using his phone;

- K.M. working at a strip club;

- Taylor putting on pants in his apartment;

- K.M. and S.C. sitting on a bed; and

- Taylor driving, singing, and showing off cash.

We agree with the State that photos and videos that do not involve a witness bearing testimony are not testimonial in nature. Courts have rejected arguments that even photographs or audio-redacted videos taken with a documentary purpose are statements and/or testimonial. *Watson v. State*, 421 S.W.3d 186, 196–97 (Tex. App.—San Antonio 2013, pet. ref'd) (silent videotaped recording of controlled buy was neither testimonial nor a statement); *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (autopsy photograph is not a testimonial statement). These holdings comport with the rule defining hearsay. *See United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019) ("photographs of Turner and the cash are images, not statements, so they too are not hearsay" as hearsay is defined by Federal Rule of Evidence 801(a)).

Authenticity rules, rather than hearsay rules, govern the admissibility of photographs. *See Tienda v. State*, 358 S.W.3d 633, 637–42, 645 (Tex. Crim. App. 2012) (discussing law of authentication of electronic evidence; relying in part on presence of "numerous photographs of the appellant with his unique arm, body, and neck tattoos, as well as his distinctive eyeglasses and earring" to tie MySpace pages to appellant); *Murray v. State*, 534 S.W.3d 540, 546–47 (Tex. App.—San Antonio 2017, no pet.) (State introduced sufficient circumstantial evidence of photographs, comments, and private messages from Facebook account to establish a prima facie case, such that reasonable jury could find appellant created and maintained contents of account).

Regardless of whether a photograph can be a hearsay statement, there is no basis to conclude the photographs in this case were created for the primary purpose of use in a criminal prosecution. *See Clark*, 576 U.S. at 245. We therefore overrule Taylor's fifth issue.

### 6. Contents of Taylor's Cell Phone (State's Exhibits 73, 78-80)

Taylor gave Allen consent to extract the data on his cell phone. Evidence culled from the data was introduced as State's Exhibit 73, 78, 79, and 80. Taylor objected on multiple grounds including confrontation. The State represented that the "first exchange will be between him and somebody he's trying to persuade and negotiate with to create fake IDs for [K.M.] and [S.C.] and the other named girls that you've heard in the case." Another conversation showed Taylor and S.C. engaging "in a crime of committing prostitution, him as the encourager and her as the one who is offering sex for money." The State argued these conversations were admissible as non-hearsay admissions by a party-opponent or co-conspirator statements. The State redacted assertions of fact from the females but left intact questions they asked as non-hearsay. Taylor reiterated his confrontation objection and stated that the females, alleged minors, were victims rather than coconspirators. The trial court overruled the objection.

Allen read aloud some content from State's Exhibit 73, including the messages the State had outlined. Hunt read aloud parts of the other exhibits. The trial court gave a limiting instruction for the messages to apply to "whatever response [Taylor's] received on those messaging devices." That instruction provided:

> You are instructed that the State presented evidence in the form of text messages that purportedly came from the defendant's cell phone. You are instructed that you cannot consider any text messages sent to the defendant's cell phone, if they were, for the truth of the matter asserted in such text messages. Such text messages are only being admitted to supply context to the text messages sent from the defendant's cell phone, if they were, and even then, you must find beyond a reasonable doubt that such text messages were sent from and to the defendant's cell phone.

*See* TEX. R. EVID. 105(a).

On appeal, Taylor argues the contents of the exhibits were testimonial in nature. The State responds that the Confrontation Clause does not apply to Taylor's own statements, and that the statements within the exhibit that were not made by Taylor "were not offered for the truth of the matter asserted."

First, the Confrontation Clause does not govern verbal expressions Taylor made that were offered against him under Rule 801(e)(2)(A). *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony'"). Second, the statements from the other declarants were not the specific type of out-of-court statements the Confrontation Clause concerns. *Id*. They were not: "*ex parte* in-court testimony or its functional equivalent," "extrajudicial statements . . . contained in formalized testimonial materials," or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 51–52 (internal quotation marks omitted); *see Walter v. State*, 581 S.W.3d 957, 981 (Tex. App.—Eastland 2019, pet. ref'd) ("The text messages in this case are informal, and their

subject and method of communication weigh against a finding that they are testimonial statements."). Because there is no indication anyone made a social-media post or sent a message with the expectation the post or message would be used in a future prosecution, the statements within them were not testimonial. *Crawford*, 541 U.S. at 52.

We therefore conclude that Taylor's confrontation rights were not violated by the admission of State's Exhibits 73, 78, 79, and 90, and overrule his sixth issue.

## CONCLUSION

Having overruled Taylor's appellate complaints, we affirm the trial court's judgment.

Beth Watkins, Justice

DO NOT PUBLISH